**Frank W. SHAVER, Plaintiff–Appellant,**

v.

**F.W. WOOLWORTH CO.,
Defendant–Appellee.**

No. 87–1043.

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1987.

Decided March 2, 1988.

Rehearing and Rehearing En Banc
Denied May 5, 1988.

Walter F. Kelly, Sutton & Kelly, Milwaukee, Wis., for plaintiff-appellant.

P. Kevin Connelly, Lederer, Reich, Sheldon & Connelly, Chicago, Ill., for defendant-appellee.

Before WOOD, CUDAHY, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff-appellant Frank B. Shaver appeals the district court's grant of summary judgment in favor of the defendant-appellee F.W. Woolworth Company on his claim that Woolworth breached its contract of employment with him, 669 F.Supp. 243. We affirm.

I.

On September 24, 1982, the F.W. Woolworth Company ("Woolworth") announced that it would close its Woolco division, consisting of 336 stores. At the time of the announcement, plaintiff-appellant Frank Shaver ("Shaver") worked as a leasing specialist at Woolworth's Central Accounting Office ("CAO") in Milwaukee, Wisconsin. The Woolco shut-down resulted in the lay-off of 183 employees in the CAO. On October 27, 1982, company officials informed Shaver at a group meeting that he was among a group of employees that would be laid off during the next several months. Woolworth asked some of those employees, including Shaver, to remain for a period of time to assist in the winding down process. Shaver was terminated on June 30, 1983.

Shaver began his employment with Woolworth in September, 1962. Upon his transfer to the CAO in June, 1972, Shaver filled out an employment application and signed his name to the following statements:

"On my engagement by F.W. Woolworth Company, this application is evidence that I agree to conform to the rules and regulations of F.W. Woolworth Company, that my engagement can be terminated at any time by F.W. Woolworth Company, I being likewise at liberty to so terminate it. Any agreement entered into between the Company and the applicant is predicated upon truthfulness of the statements herein contained."

A booklet given to Mr. Shaver by Woolworth initially governed the terms of Mr. Shaver's employment at the CAO. It provided in part:

"Like most organizations with long histories, we have developed policies and procedures that years of experience have proven to be productive. This booklet will assist you in understanding some of these policies and procedures, and will explain many aspects of your duties in the Central Accounting Office. *It will tell you what we expect from you, and what you may expect from us.*"

(Emphasis added). In March, 1982, a CAO employee handbook replaced the prior booklet. Documents submitted in response to Woolworth's motion for summary judgment establish that Mr. Shaver verified his receipt of the handbook on a written acknowledgment form, and returned it to the CAO personnel department. The first page of the handbook contained virtually the identical language as its predecessor:

"This booklet will assist you in understanding our policies and procedures, and will explain many aspects of your duties in the Central Accounting Office. It will tell you what we expect from you, and what you may expect from us."

At page 12, the employee handbook contained the following seniority layoff provision:

"Your seniority is important to you and to the Central Accounting Office and it means the length of time you have worked for us since your most recent date of hire. Seniority, along with abili-

ty and performance, is an important factor for job transfer and promotion opportunities. In the history of the CAO, the need to reduce the number of employees has occurred on rare occasions—and even then, only a few employees were affected. It is important for you to know that if a reduction of staff should be necessary, layoff and recall after layoff will be determined on the basis of seniority and an employee's skill and ability to do the available work. *Where the factors are relatively equal among several employees, those with the greatest seniority will be given preference over those employees with less seniority."*

(Emphasis added). The handbook concluded:

"In closing, the information in this handbook has been prepared as a convenient reference for your use at work or at home. These are today's policies and rules—it is safe to say, our practice is to continually review and revise them as needed—always keeping in mind the needs of the people who make up the organization."

At trial, Shaver contended that the statements contained in the employee handbook created a contract between Shaver and Woolworth, a contract Woolworth breached when it laid off Shaver without following the seniority provisions contained on page 12 of the handbook. The deposition testimony of CAO officials supports Shaver's argument that Woolworth failed to follow the handbook's seniority provision during the layoff of CAO employees. As an example, Les Zoch, general manager and controller of the CAO, testified that in determining which employees to lay off, Woolworth officials did not discuss the possible applicability of the seniority provisions due to the press of time and the need to "cut to the bone." Further, Gerald Nelson, CAO salary administrator at the time of the layoffs, testified that Zoch told him that because the Woolco closing was a "rather unique situation," Woolworth did not apply the seniority provisions to the layoffs.

On May 2, 1984, Shaver commenced an action in federal district court (*Shaver I*),

alleging that his discharge violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Shaver's complaint also joined pendent state claims. On August 21, 1985, the trial judge granted Woolworth's motion for summary judgment on the ground that Shaver failed to file his federal ADEA claim timely; further, the court declined to exercise pendent jurisdiction over the remaining state claims. Shaver neither attempted to allege an alternative jurisdictional basis in an attempt to pursue his state law contract claims, nor did he appeal the court's entry of judgment in Woolworth's favor.

Subsequently, on February 13, 1986, Shaver filed a second lawsuit against Woolworth, this time in the Circuit Court for Milwaukee County, Wisconsin, alleging breach of contract and negligent employment termination under Wisconsin law, as well as a violation of the Wisconsin Fair Employment Practices Act. Woolworth, over Shaver's objection, successfully removed the lawsuit to federal court pursuant to 28 U.S.C. §§ 1332, 1441 on the basis of diversity of citizenship. Woolworth moved for summary judgment with respect to each of Shaver's claims after the parties had completed their supplemental discovery. In its motion, Woolworth argued that it was entitled to summary judgment on the merits, and furthermore Shaver's action was barred under the doctrine of *res judicata.* The district court, agreeing with Woolworth's substantive argument that the terms of the employee handbook did not impose a contractual limitation on Woolworth's right to terminate Shaver's employment, entered judgment in favor of Woolworth, but did not address Woolworth's contention that the second lawsuit was foreclosed under *res judicata* principles.

## II.

Although the district court did not consider the issue, we believe that before attempting to resolve issues involving the state law of Wisconsin (Shaver's claims for

breach of contract and negligent employment termination under Wisconsin law), it is appropriate to address Woolworth's argument that the doctrine of *res judicata* bars this lawsuit: Shaver's second action against Woolworth. Woolworth maintains that *res judicata* operates to forbid this action because in *Shaver* I, Shaver could have, but chose not to, allege the existence of an alternative basis for subject matter jurisdiction after the district court dismissed his pendent state claims along with his federal ADEA claim. According to Woolworth, once the federal court dismissed Shaver's federal claim, he could have alleged diversity of citizenship as a jurisdictional basis [1] in order that he might pursue any state law theories of recovery arising out of the same occurrence, and under the doctrine of *res judicata* his failure to pursue state law claims for relief prevents him from attempting to litigate those claims in the present lawsuit.

■ Woolworth's contention—that Shaver's failure to allege the existence of diversity jurisdiction in *Shaver* I bars this state law breach of contract action—relies on the crucial distinction between the preclusive effect of *res judicata* and collateral estoppel. In contrast to collateral estoppel, which bars issues *actually litigated and decided* in a previous lawsuit, the doctrine of *"res judicata* bars not only those issues which were actually decided in the prior action but also any issues which *could have* been raised." *Lee v. City of Peoria*, 685 F.2d 196, 198 (7th Cir.1982) (*citing Whitley v. Seibel*, 676 F.2d 245, 248 (7th Cir.1982)) (emphasis added). Woolworth's argument requires us to determine whether or not a plaintiff who initially sues in federal court must attempt to join all theories of relief arising under state law in a single proceeding if and when a jurisdictional basis for doing so exists.

In determining whether or not Shaver's prior Age Discrimination suit (based on the same core of operative facts as this lawsuit) bars him from maintaining this state law cause of action, we note the holding of *Matter of Energy Cooperative, Inc.*, 814 F.2d 1226, 1230 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987): when "the prior litigation was brought in federal court, the federal rule of *res judicata*" applies. The Court in *Brown v. J.I. Case Co.*, 813 F.2d 848 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 258, 98 L.Ed.2d 215 (1987) set forth the essential elements of *res judicata* as "(1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and later suit; and (3) an identity of parties or privies in the two suits." 813 F.2d at 854 (quoting *Lee v. City of Peoria*, 685 F.2d 196, 199 (7th Cir.1982)). The parties fail to discuss these three requirements in their briefs, and for reasons we cannot understand, instead focus on the question of whether or not *res judicata* should extend to the factual situation before us as a matter of public policy. This approach is ill-advised for "[o]nce a litigant satisfies the prongs of the test, a later suit should be barred since there is little, if any, room left for making further policy arguments." *Smith v. City of Chicago*, 820 F.2d 916, 917 (7th Cir.1987) (citing *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981)).

In *Moitie*, the Supreme Court stressed that:

> " *'[the] doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours, it is a rule of fundamental and substantial justice, "of public policy and of private peace," which should be cordially regarded and enforced by the courts....'* Hart Steel Co. v. Railroad Supply Co., 244 U.S. 294, 299, 37 S.Ct. 506, 507, 61 L.Ed. 1148 (1917). The language used by this court half a centu-

---

1. The record establishes that Shaver in fact knew that diversity jurisdiction existed in the prior age discrimination lawsuit. As part of his discovery in *Shaver* I, Shaver inquired into the factual basis for Woolworth's denial of diversity jurisdiction. In its response, Woolworth stated that it had not denied the existence of diversity jurisdiction, and explained its belief that diversity jurisdiction did exist. Nevertheless, Shaver did not amend his complaint to include diversity of citizenship as a jurisdictional basis.

ry ago is even more compelling in view of today's crowded dockets: 'The predicament in which respondent finds himself is of his own making.... [W]e cannot be expected, for his sole relief, to upset the general and well-established doctrine of res judicata, conceived in light of the maxim that the interest of the state requires that there be an end to litigation —a maxim which comports with common sense as well as public policy. And the mischief which would follow the established precedent for so disregarding this salutory doctrine against prolonging strife would be greater than the benefit which would result from relieving some case of individual hardship.' *Reed v. Allen,* 286 U.S. [191] at 198–199, 52 S.Ct. [532] at 533 [76 L.Ed. 1054 (1932)]."

452 U.S. at 401–02, 101 S.Ct. at 2429 (emphasis added). In light of these legal parameters, we refuse to depart from traditional *res judicata* doctrine when and if the requirements of the doctrine are met. It is essentially undisputed that the first and third elements of *res judicata* are satisfied in this case: a final judgment on the merits was rendered in the previous action between the parties to this lawsuit. We analyze whether the causes of action are identical.

This court recently held that federal law defines a single "cause of action" as " 'a core of operative facts' which give rise to a remedy," *In the Matter of Energy Cooperative, Inc.,* 814 F.2d at 1230–31 (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 789 F.2d 589, 593 (7th Cir.1986)). That case also approved the approach of section 24 of the Restatement (Second) of Judgments (1982): "Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or lost." *Id.*

■ As noted previously, *res judicata* operates as a bar to the litigation of matters that could have been raised in a prior proceeding. *Lee,* 685 F.2d at 198. This application of the doctrine of *res judicata* prevents the splitting of a single cause of action and the use of several theories of recovery as the basis for separate suits.

*See Button v. Harden,* 814 F.2d 382, 384 (7th Cir.1987). Hence, the federal definition of a cause of action, when combined with the rule against claim-splitting, requires that a plaintiff allege in one proceeding all claims for relief arising out of a single core of operative facts, or be precluded from pursuing those claims in the future.

■ Applying the federal definition of a "cause of action" to the case at hand, plaintiff's prior age discrimination lawsuit and the instant breach of contract action arise out of the same core of operative facts, Woolworth's liquidation of Woolco and Shaver's layoff. Since the two lawsuits involve this single core of operative facts, they constitute identical causes of action for *res judicata* purposes. Although this single group of facts may conceivably give rise to different claims for relief upon different theories of recovery, under the federal definition a single cause of action remains. *See Lee,* 685 F.2d at 200. Thus, the federal *res judicata* doctrine precludes Shaver from litigating any matters that he could have raised in the previous lawsuit.

In an attempt to circumvent the doctrine's application and despite the presence of the three doctrinal elements, Shaver relies on a policy argument. Shaver asserts, *inter alia,* that requiring a plaintiff to allege the possible existence of federal diversity jurisdiction to pursue state law claims once pendent to federal claims after both the federal and state claims are dismissed runs counter to the federal policy of leaving primarily state law questions to the state courts. Although not completely analogous on its facts, this court's decision in *Harper Plastics v. Amoco Chemicals Corp.,* 657 F.2d 939 (7th Cir.1981), answers Shaver's argument.

In *Harper,* the court considered whether *res judicata* bars a litigant from bringing a contract claim in state court following a dismissal on the merits of his federal antitrust claim where the litigant did not join the contract claims in the original federal action pursuant to the court's pendent jurisdiction. As Shaver does here, the plaintiff in *Harper* argued that it is unfair to

require a plaintiff to join state theories of relief in a federal complaint where those state claims could only be entertained under the doctrine of pendent jurisdiction. Moreover, the plaintiff asserted that because pendent jurisdiction is discretionary, a plaintiff cannot know with certainty that the federal court will elect to hear pendent claims, and therefore a plaintiff should not be expected to plead them all. Finally, the plaintiff argued that in light of burgeoning court dockets, federal policy should not operate to "force" pendent state claims on the federal courts.

The Court of Appeals rejected the plaintiff's contentions, holding that "[w]e fail to discern the unfairness in requiring a plaintiff to join all relevant theories of relief in a single proceeding." 657 F.2d at 946. The court explained:

"*The uncertainty over whether a trial judge would exercise pendent jurisdiction does not justify permitting the institution of a multiplicity of proceedings which may have the effect of harassing defendants and wasting judicial resources.* If appellant entertained any doubts at the pleading stage, they should have been resolved in favor of joinder....

A dismissal of the claims for relief under federal law in a complaint to which pendent state claims have been joined does not of itself end the litigation. '[I]f it appears that the state issues predominate, whether in terms of proof, of the scope of issues raised, or the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.' *United Mineworkers v. Gibbs,* 383 U.S. [715] at 727, 86 S.Ct. [1130] at 1139 [16 L.Ed.2d 218 (1966)]. Conversely, if the district judge finds that the federal claims are insubstantial, the entire action may be dismissed and the plaintiff will be permitted to pursue the common law claims in a state tribunal. *Id.* In this light, appellant's assertion that including the state contract claim might have prevented it from arguing

that claim on the merits in the event of a dismissal from federal court is clearly incorrect. To the contrary, if appellant wished to preserve that claim, Rule 18 joinder was the proper device.

Finally, we must reject appellant's contention that it is unfair to force pendent claims on federal trial courts. If this were so, then one may as well argue that the entire doctrine of pendent jurisdiction is unfair, since the effect of its application is to busy the federal court with matters of state law. *The primary purpose of the doctrine is to promote fairness to litigants and judicial economy by disposing of a controversy in a single proceeding....* This, combined with the broad joinder provisions of the federal rules, gives appellant's argument a hollow ring."

657 F.2d at 946 (emphasis added) (citations omitted). *See also First Alabama Bank v. Parsons Steel, Inc.,* 747 F.2d 1367, 1375–76 (11th Cir.1984), *rev'd on other grounds,* 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986) (following *Harper*); *Hudson v. Chicago Teachers Union Local No. 1,* 743 F.2d 1187, 1200 n. 1 (7th Cir.1984), *aff'd,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986) (Flaum, J. concurring) (while pendent jurisdiction is not compulsory *as to the Court,* it is compulsory as to the parties). We agree with Woolworth's assertion that the rationale for applying *res judicata* is even more compelling in this case than in *Harper.* While in *Harper* the plaintiff illegally split his claim when he did not assert pendent and hence, discretionary state claims along with his federal action, Shaver failed to assert a basis for jurisdiction (diversity) which had it proven to be applicable, a federal court would have no discretion to reject. *See, e.g., Hemmings v. Barian,* 822 F.2d 688, 693 (7th Cir.1987). Since diversity jurisdiction is not a doctrine of discretion, but of plaintiff's right, any uncertainty over whether the trial judge would entertain the claim that was present in *Harper* is absent from Shaver's situation.[2]

---

**2.** The dissent broadly asserts that *Harper* fails to

answer the policy concerns implicated by our

The doctrine of *res judicata* ensures that a controversy once decided becomes final.

application of the *res judicata* doctrine to require a plaintiff who chooses the federal forum to allege *all* basis for jurisdiction in a single judicial proceeding. Initially, the dissent argues that our holding today does not serve the purposes underlying *res judicata* doctrine—judicial economy and the protection of defendants against the harassment of repetitive and duplicative lawsuits—since "if a federal claim is dismissed before trial (as here by summary judgment) the judicial burden is about equally onerous whether the pendent claims are then tried in federal or state court." The assertion that the policies underlying *res judicata* doctrine are not advanced by requiring a plaintiff to allege all possible bases for jurisdiction in a single judicial forum is simply not correct. Multiple lawsuits in separate forums, as well as requiring more than one court to analyze and digest the facts of a case, all have the effect of harassing defendants and wasting judicial manpower—the precise dangers the doctrine intends to prevent. "One major function of claim preclusion is to force a plaintiff to explore all the facts, develop all the theories, and demand all the remedies in the *first suit.*" 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4408 at 65 (1981). Although peculiar problems of claim preclusion arise from the expansion of federal jurisdiction (e.g., pendent and diversity jurisdiction) affording federal courts jurisdiction to hear state law claims, the trend of recent decisions is to require a plaintiff to invoke all possible bases for jurisdiction in the first forum chosen. *Id.* § 4412. As explained in Wright and Miller, where "both state and federal courts have full independent jurisdiction over all theories, nothing in federal law limits state court jurisdiction, and the federal court has both federal question *and diversity jurisdiction* [; s]everal decisions have ruled that ... there is a single claim, all parts of which must be presented to the first court chosen." *Id.* at 95 (emphasis added) (footnote omitted). Moreover, *Harper* directly answers the dissent's concern that our application of *res judicata* to jurisdictional questions will operate to force state claims upon the federal courts:

"... we must reject appellant's contention that is unfair to force pendent claims on federal courts. If this were so, then one may as well argue that the entire doctrine of pendent jurisdiction is unfair, since the effect of its application is to busy the federal court with matters of state law. *The primary purpose of the doctrine is to promote fairness to litigants and judicial economy by disposing of a controversy in a single proceeding....* This, combined with the broad joinder provisions of the federal rules, gives appellant's argument a hollow ring."

657 F.2d at 946 (emphasis added).

The dissent also maintains that "most fundamentally, this is not a case of the *plaintiff's* splitting his claims," because the *court*, rather than Shaver, dismissed Shaver's pendent claims

in his initial lawsuit against Woolworth. But this argument ignores the fact that it was the *plaintiff's* deliberate decision: (1) to initially choose the federal forum; and (2) to bypass his right to invoke the existence of diversity jurisdiction after dismissal of his federal question claim in federal court. Thus, contrary to the dissent's assertion, Shaver's attempt to institute two separate proceedings in different forums runs contrary to the rule against claim-splitting.

Finally, the dissent vaguely contends that the comity and federalism problems inherent in requiring a plaintiff to invoke the federal court's diversity jurisdiction after dismissal of federal question and pendent state law claims renders the rule unworkable. The dissent's only specific example of a comity and federalism problem is its concern that a state court may fail to apply a federal *res judicata* bar to pendent claims dismissed by a federal court, thus creating an incentive for the defendant to remove the case to federal court where the rule will be applied. Hence, the dissent asserts, a problem of forum-shopping.

This argument is unpersuasive for two reasons: (1) the concern that a state court may refuse to apply a federal rule of *res judicata* is inherent in the already accepted rule requiring a plaintiff to invoke the federal court's pendent jurisdiction where the plaintiff chooses the federal forum; and (2) the argument rests on the untenable assumption that state courts will in fact ignore the *res judicata* effect of the prior federal judgment. (Cases such as *Anderson v. Phoenix Inv. Counsel*, 387 Mass. 444, 440 N.E.2d 1164, 1167-70 (1982) suggest otherwise. *Anderson*, a case factually analogous to *Harper*, ruled that the preclusive effects of a federal judgment should be determined under *federal law*, and that the plaintiff's state claims were barred as a result of his failure to attempt to join them as pendent claims in a prior federal proceeding.) Should a state court refuse to apply a federal rule of *res judicata*, the mere fact that the federal court's removal jurisdiction provides a sure means of enforcing the claim preclusion consequences of a prior federal judgment is no reason to reject the federal rule. *Cf. Salveson v. Western States Bankcard Ass'n*, 731 F.2d 1423 (9th Cir.1984) (removal jurisdiction invoked to enforce the *res judicata* effect of a prior federal judgment where plaintiff's state law claim was an "artfully pled" federal antitrust claim).

In sum, the alleged "parade of horribles" trotted out by the dissent is merely the logical result of the federal court's diversity jurisdiction and the policies underlying *res judicata* doctrine. While the dissent appears to agree with those commentators who advocate the abolition of diversity jurisdiction, such questions, because they are legislative in nature, should be decided by Congress, not by the courts. Thus, they should not be injected into the legal analysis.

It is not a "mere matter of practice or procedure inherited from a more technical time than ours." *Moitie*, 452 U.S. at 398, 101 S.Ct. at 2427. Rather, because the doctrine "encourages reliance on judicial decisions, bars vexatious litigation and frees the courts to resolve other disputes," *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979), it is considered a rule of "fundamental and substantial justice ... which should be cordially regarded and enforced by the courts...." *Moitie*, 452 U.S. at 401, 101 S.Ct. at 2429.

Because Shaver neglected to assert the existence of diversity jurisdiction in his prior action in order to pursue his breach of contract claims, both the strict test of and the policy behind the *res judicata* doctrine bars the present action. Although the facts of Shaver's situation (involving the failure to assert the existence of diversity jurisdiction) are unique, they nonetheless present a classic case for the application of the doctrine of *res judicata*, and in accordance with *Harper*, there is no policy justification for not applying the doctrine. Whatever hardship that may inhere in this result could have been avoided. Since Shaver originally chose the federal court as his forum, he should have, under the well-reasoned rule against claim-splitting, included all the relevant theories of relief in a single action that the federal forum provides. Both the federal court's diversity jurisdiction and the broad joinder provisions of the Federal Rules of Civil Procedure provided Shaver the opportunity to pursue his state law claims at the same time as his federal ADEA claim. His failure to pursue those claims in the forum originally selected precludes him from taking a second bite of the apple.

AFFIRMED.

CUDAHY, Circuit Judge, dissenting:

The majority has decided this difficult case on a wholly novel theory that was ignored by the district court. The majority purports to see the case as a matter of "traditional res judicata doctrine," *see supra* p. 1365, preponderating over mere "policy" arguments. But, of course, res judicata itself rests on well-known policy objectives. These policies seem to me not much furthered by the majority result nor are other important policies (such as those involving comity and considerations of federalism) adequately considered here. The majority opinion is little more than a ritual incantation against "claim splitting" as a mechanical response to all the contradictions inherent in the problem before us.

The majority has declared that, when a plaintiff fails to plead diversity of citizenship as an alternative basis of federal subject-matter jurisdiction over claims otherwise pleaded as pendent, and the federal claim is dismissed and the state claims concurrently dismissed under *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), the latter dismissals are res judicata of the state claims. Merely to state this apparent holding is to underline its novelty. First, I do not believe the majority's rule materially advances the policies underlying res judicata doctrine: judicial economy and protection of defendants against the harassment of repetitive and duplicative lawsuits. *See Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979) ("Res judicata ... encourages reliance on judicial decisions, bars vexatious litigation, and frees the courts to resolve other disputes."). For, if a federal claim is dismissed before trial (as here by summary judgment) the judicial burden is about equally onerous whether the pendent claims are then tried in federal or in state court. The defendant's burden likewise is not altered significantly by the transferring of the state claims against him from federal to state court. (In fact, the pendent state claims may never be resurrected once they are dismissed in federal court.)

Second, and most fundamentally, this is not a case of the *plaintiff's* splitting his claims. He brought in federal court all the claims arising from the relevant nucleus of operative facts. But the *court*, pursuant to *United Mine Workers v. Gibbs*, dismissed the pendent claims, freeing the plaintiff to bring them in state court. The

Fifth Circuit, in comparable circumstances, has explained the claim-splitting rule:

> Put another way, the rule—protective both of the court and of the defendant—precluding litigants from splitting causes has no function where the court itself, rather than the litigant, does the splitting and does it by reason of no default on the part of the litigant, who timely advanced all his claims in the initial proceeding.

*Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 563 (5th Cir.1983).

Third, the comity and federalism problems presented by the majority's approach are profound and cannot be explained away merely by citing *Harper Plastics v. Amoco Chems. Corp.*, 657 F.2d 939 (7th Cir.1981). *Harper Plastics*, of course, says:

> [I]f the district judge finds that the federal claims are insubstantial, the entire action may be dismissed and the plaintiff will be permitted to pursue the common law claims in a state tribunal.

657 F.2d at 946. On this point, *Harper Plastics* merely follows *United Mine Workers v. Gibbs*. But the crucial question in the instant case is this: if the dismissed pendent claims are brought in the state court, must that court dismiss these claims as barred by the res judicata effect of the federal suit? To dismiss these claims, the state court would have to apply a purportedly federal res judicata bar (involving failure to invoke diversity jurisdiction) to a state cause of action brought, of course, in a state court. Such a requirement seems to me so disruptive of any notions of federalism that I cannot imagine the Supreme Court's approving it. In fact,

I have never heard of a state court's *requiring* a litigant to invoke the diversity jurisdiction (nor has such a requirement ever emerged from a *federal* court, for that matter).

Fourth, perhaps the "answer" to the third point, above, is that, while the state court need not find a res judicata bar, the case may be removed to federal court, which can and will apply res judicata. But this "solution" creates an obvious *Erie* problem. *See Erie RR. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The result clearly would depend entirely on the forum (a huge incentive to forum shopping). Federal courts would apply a putative federal res judicata rule and state courts would ignore it. This would be absurd.

The issues here of comity and federalism are so much more crucial than any issue of alleged claim splitting that the majority's outcome cannot stand.

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*United Mine Workers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139 (footnotes omitted). In addition, of course, the majority here *requires* recourse to the diversity jurisdiction at a time when many authorities (notably including former Chief Justice Burger) advocate the abolition of that jurisdiction.[1]

---

1. In one of his annual state of the judiciary reports, the former Chief Justice stated that diversity cases have no more place in the federal courts in the second half of the twentieth century, and surely not in the final quarter of this century, than overtime parking tickets or speeding on the highways simply because the highway is federally financed.... In any event, nonfederal cases must be decided under state law and can best be handled by state judges. They are at least as familiar with that law as federal judges. Appeals in such cases can better be reviewed by those state judges than federal judges from other states.

Burger, Annual Report on the State of the Judiciary, 1976 A.B.A.J. 443, 444. For a description of the debate and citations of articles written in favor of retaining or abolishing diversity jurisdiction, see C. Wright, *The Law of Federal Courts*, 127–37 (4th ed. 1983).

My purpose in citing these authorities is simply to show that the majority is swimming upstream in terms of much current thinking about diversity jurisdiction. I would hasten to add that I continue to regard that jurisdiction as important and have never advocated its abolition. In any event, despite the assertions of the majority, I am unaware of a "trend" in the law

Essentially, the majority's res judicata analysis must fail because (1) the plaintiff did not split his claims (the court did) and (2) for good reason there is no authority anywhere that a plaintiff may be required to invoke the diversity jurisdiction.

On the merits, although the matter is close and I have the highest regard for Judge Curran's analysis of Wisconsin law, I believe the summary judgment must be reversed. Employee handbooks may be express contracts of employment in Wisconsin. *Ferraro v. Koelsch*, 124 Wis.2d 154, 368 N.W.2d 666 (1985). The circumstances in *Ferraro* are analogous in many ways to the facts of the case before us. For example, both Ferraro and Shaver had agreed in their employment applications that they could be terminated at any time. *Id.* at 158, 368 N.W.2d at 669; Brief of Plaintiff–Appellant at 7. Ferraro, however, received a handbook that "require[d] that employees not be dismissed or laid-off without just cause." 124 Wis.2d at 159, 368 N.W.2d at 669. Shaver also received a handbook; it provided that Woolworth would lay off employees only on the basis of seniority:

> It is important for you to know that if a reduction of staff should be necessary, lay-off and recall after lay-off *will be determined on the basis of seniority* and an employee's skill and ability to do the available work. Where the factors are relatively equal among several employees, those with the greatest seniority will be given preference over those employees with less seniority.

Appendix of Defendant–Appellee at 9 (emphasis added).[2]

Both Shaver and Ferraro signed written acknowledgements of receipt of their handbooks. Ferraro's stated that he understood "the policies and rules and accept[ed] them as a condition of [his] continued employment." 124 Wis.2d at 158, 368 N.W.2d at 669. Although Shaver's Acknowledge-ment Form did not condition his employment on the terms of the handbook, Woolworth had prefaced the booklet as follows:

> This booklet will assist you in understanding our policies and procedures, and will explain many aspects of your duties in the Central Accounting Office. *It will tell you what we expect from you, and what you may expect from us.*

Appendix of Defendant–Appellee at 3 (emphasis added).

Finally both handbooks contained express promises from the employee. *See, e.g.*, 124 Wis.2d at 166, 368 N.W.2d at 672 (two-week notice prior to leaving); Appendix of Defendant–Appellee at 4 (telephone notification of absence prior to starting time).

In *Ferraro*, the Supreme Court of Wisconsin considered these factors and instructed courts "to examine the nature of the handbook" to determine whether it created an express contract. 124 Wis.2d at 167, 368 N.W.2d at 673. The court then held that

> whatever the original relationship between the parties—and it is apparent that if no other evidence were available than that in the original application for employment, the relationship would be "at will"—the promises in the handbook, coupled with the return promises of the employer Ferraro, resulted in an express contract incorporating all the provisions thought desirable by the employer in respect to obligations of the employee, misconduct, and employee discipline and discharge.

*Id.*

In the present case, the provision of the handbook outlining the seniority policy, in conjunction with its preface of mutual expectation, arguably created an enforceable agreement between the company and its employees. Therefore, under *Ferraro*, I

---

toward the mandatory invocation of diversity jurisdiction.

**2.** The Supreme Court of Wisconsin found a similar provision in Ferraro's handbook to be evidence of a contractual limitation of the at-will relationship:

> That this was an abrogation of an at-will relationship, if such were originally intended, is clear from the language of the handbook. For example, the [employer] promised that, in the event of layoffs, any layoff "will be based on your seniority."

124 Wis.2d at 165, 368 N.W.2d at 672.

believe summary judgment is inappropriate in this case.