Annunzio C. FERRARO, Plaintiff-Respondent-Petitioner,

v.

Thomas P. KOELSCH and Kevin Jorgenson, Defendants,

HYATT CORPORATION, d/b/a Hyatt Regency Milwaukee, Defendant-Appellant.

Supreme Court

*No. 83–1205. Argued January 2, 1985.—*
*Decided June 5, 1985.*

(Also reported in 368 N.W.2d 666.)

For the plaintiff-respondent-petitioner there were briefs by *Nancy J. Meissner* and *Riordan, Crivello, Carlson, Mentkowski & Henderson,* Milwaukee, and oral argument by *Ms. Meissner.*

For the defendant-appellant there was a brief by *Matthew J. Flynn, David R. Cross* and *Quarles & Brady,* Milwaukee, and oral argument by *Mr. Flynn.*

HEFFERNAN, CHIEF JUSTICE. This case comes to us on the review of a decision of the court of appeals which reversed a judgment of the circuit court for Milwaukee county, Ralph Adam Fine, circuit judge.[1]

We affirm the court of appeals decision, although we do so on a legal premise different from that relied upon by the court of appeals.

The question on review is whether, as a matter of law, representations in an employees' handbook may limit the power of an employer to terminate an employment relationship which would otherwise be terminable at will. The court of appeals held "as a matter of law there is no credible evidence that Hyatt and Ferraro agreed to be bound by the handbook." 119 Wis. 2d at 409. The court of appeals used the "matter of law" language because of its apparent conviction that an employment relationship terminable at will could not thereafter be altered and therefore any evidence to the contrary in respect to an employees' handbook accepted by an employee was irrelevant.

That this was the attitude or rationale of the court of appeals is reinforced by its rejection of Ferraro's position "that the contents of the employees' handbook imposed limitations, be they *expressed* or *implied* on the termination rights of the at-will relationship." (Emphasis supplied.) 119 Wis. 2d at 411. Thus, the court of appeals appears to have held that even a limitation on the employer's right to terminate at will expressly stated in the handbook and accepted by the employee is ineffective under Wisconsin law to alter the relationship in respect to an employment terminable at will.

We conclude that such a handbook may, and that in the present instance it did, convert the employment relation-

---

[1] The opinion accompanying the decision of the court of appeals was published. *Ferraro v. Koelsch*, 119 Wis. 2d 407, 350 N.W.2d 735 (Ct. App. 1984).

ship into one that could only be terminated by adherence to contractual terms—that the acceptance by the employee Ferraro of the terms set forth in the handbook created an employment contract. We also conclude that in this case Hyatt correctly followed the contract procedures for discharge and Ferraro was properly discharged for cause.

Because the court of appeals concluded that, as a matter of law, Hyatt could not have been limited by the provisions of the handbook, it considered it unnecessary to examine the jury's finding that Hyatt had breached the contract provisions set forth in the contract. Upon examination of the record, we conclude there was no credible evidence upon which the jury could have found that Hyatt breached the express contract created by the representations and offers of the handbook and the employee's specific acceptance of them as a condition for further employment.

The record reveals that Annunzio Ferraro sought and was offered employment as a security guard with the Hyatt Corporation at its Milwaukee hotel. His job application form, dated April 18, 1980, just above his signature, states:

"I agree that my employment may be terminated by this Company at any time without liability for wages or salary except such as may have been earned at the date of such termination."

Ferraro testified, however, he was given the employees' handbook at the time he commenced work in May of 1980. The last paragraph of the 48-page handbook requires the following statement to be signed by the employee:

"I hereby acknowledge having received and read the Hyatt Regency Milwaukee Employee's Handbook. Furthermore, I understand the policies and rules and accept them as a condition of my continued employment.

If I require interpretation, translations or clarification on the contents of the Handbook, I understand it is my responsibility to inquire immediately about such."

The date affixed to the acknowledgment signed by Ferraro was August 6, 1980.[2] Included in the comprehensive booklet are the following provisions that are particularly pertinent to our review:

"Disciplinary Action

"In order for HYATT to maintain a desirable level of employee conduct and productivity, HYATT policies must be enforced. HYATT policy requires that employees not be dismissed or laid-off without just cause. However, should an employee violate a HYATT rule or policy, including those rules set forth by each department, disciplinary action may be necessary and the following steps will be taken:

"1. A *verbal warning* may be given as an initial indication of lack of satisfaction with work performance, or for the *first* violation of an established HYATT rule or policy.

2. If the employee fails to correct his/her poor performance, or commits an additional violation of an established HYATT rule or policy, a *written warning* will be issued.

"3. In general, 2 prior warnings for similar offenses should be given before an employee is dismissed or suspended.

"4. The purpose of a suspension is to give the employee the opportunity to think about whether he/she wants to follow HYATT rules or find another job. The suspension period will depend upon the seriousness of the offense.

5. When an employee continues to violate a HYATT rule or policy, or fails to improve his/her job performance, it may become necessary to dismiss him/her.

[2] We deem irrelevant whether the signing by Ferraro occurred in May or in August. Both dates preceded the facts giving rise to this lawsuit. We do not consider whether signing was even necessary, for Ferraro accepted, *i.e.*, performed, in response to and with the knowledge of the handbook contents.

"In the case of a severe rule violation, dismissal may be without prior warnings. HYATT policy requires an investigation prior to dismissal.

"Just Causes For Dismissal

"The following rules are EXTREMELY IMPORTANT and should be reviewed carefully by each employee. The violation of these rules will be considered sufficient cause for immediate dismissal.

". . . .

"6. Disrespectful conduct. Gambling or fighting on hotel premises; coercion, intimidation or threats of any kind against guests, supervisors or fellow employees; using vulgarity or failing to give a high degree of service and courtesy to any guest; soliciting gratuities from guests or commenting in any way as to the amount of gratuity given.

". . . .

". . . if we must layoff any employees, it will be based on your seniority within your job classification in the department you are currently working in.

"Those employees who are still within their probationary period can be separated from their employment at the hotel immediately for conduct deemed undesirable.

"Normally a two-week notice is expected unless other arrangements have been made with your supervisor. Leaving without notice may affect your work record with us."

Earl Nightingale, the executive manager, testified that the booklet is issued to new employees and is a statement by Hyatt of what the corporation offers its employees and what Hyatt expects its employees to do for the company.

After Ferraro's hiring in May of 1980, he worked as a security guard until March 18, 1981, when he was discharged. During this period, but prior to the incident that occasioned the firing, several incidents occurred involving Ferraro. On September 8, 1980, Ferraro, who had been a professional boxer, struck an

allegedly intoxicated guest after the guest had struck the first blow. Ferraro's conduct was reported, and he was warned not to touch or hit any guest under any circumstances. On another occasion he was also warned by his immediate supervisor because he raised his voice while arguing with a guest in the Atrium bar of the hotel. There were also complaints against him in respect to the harassment of women employees.

Nevertheless, it does not appear from the record that Ferraro was ever given any written warnings about his conduct. The record shows that a management evaluation of Ferraro's performance dated December 10, 1980, revealed a uniformly "superior" performance.

The triggering incident occurred on February 25, 1981, when Thomas Koelsch was verbally and physically assaulted in the Hyatt employees parking lot. Koelsch was intending to bring some documents to a client, Kevin Jorgenson, who was a guest at the hotel and who was waiting for him in the hotel lobby. Finding no place to park on the street, Koelsch parked in the employees parking lot. Ferraro, who was on duty, told him to leave, and when Koelsch explained he was going to be there only for a short time, Ferraro told him to "get the hell out of here," grabbed him, and attempted to force him back into his car and began a "foul shouting match."

Koelsch went into the hotel and complained to the manager on duty, James Behrendt, Ferraro's immediate supervisor. Ferraro followed Koelsch into the hotel and began a "verbal, abusive, foul attack" on Koelsch, and told Koelsch to "shut up" when he attempted to complain to Behrendt.

The episode in the parking lot was confirmed by Koelsch's client Jorgenson, who witnessed the alterca-

tion, but the facts were disputed by a security guard in a nearby parking lot who sided with Ferraro.[3]

Shortly after the meeting with Koelsch and Ferraro, Behrendt stated that there was no basis for the complaint made by Koelsch and there was no reason to dismiss Ferraro.

About three days after the incident, Executive Manager Nightingale, after reading the report of Night Manager Behrendt, interviewed Ferraro. He stated at trial that at that time he had not then made the decision to fire Ferraro. He testified, however, that, after he later spoke to Behrendt about the incident, read the report of the witness who attended the nearby parking lot, and spoke to the general manager and personnel director, he then, without further warning to Ferraro, fired him.

The memorandum placed in Ferraro's file the next day, March 19, 1981, stated:

"The reason for Annunzio's termination was that on these three occasions [documented in his personnel file] he has displayed poor judgment along with certain acts of aggression and the ability to lose his temper under pressure. Because of his inability to control his temper under pressure situations it became necessary to terminate his employment."

At trial he stated that he fired Ferraro on the basis of his conduct on February 25, 1981, which violated Hyatt's Rule 6 contained in the handbook, and also stated that he took into consideration other incidents involving Ferraro that were contained in his personnel file.

---

[3] The statements of Koelsch and of Jorgenson synopsized above are gleaned from letters sent by each of them to the Hyatt management complaining about Ferraro's conduct. The jury found that each of these letter statements was true and accurately recounted the February 25, 1981, incident. Their accuracy is not challenged.

Approximately a year later, Ferraro commenced this action against Hyatt for wrongful discharge and also against Koelsch and Jorgenson for conspiring to defame him.[4]

The jury found that, at the time of hiring Ferraro, Hyatt agreed to be bound by the provisions of the employees' handbook, but also found that Hyatt violated the handbook rules when it fired Ferraro.

The court of appeals disposed of the question of whether the handbook was binding by agreeing with Hyatt's contention that there was no credible evidence to support the jury verdict that Hyatt and Ferraro agreed to be bound by the terms of the handbook at the time that Ferraro was hired. To decide the issue on the legal effect of the handbook and its acceptance at the *time of hiring* to some extent begs the question, for, in the context of this case, the problem is whether the terms of the handbook were binding at the time of the incident that led up to Ferraro's discharge. Nevertheless, Hyatt's attack on the jury verdict, even as it relates to the time of hiring, must fail, for there was evidence the jury could have believed that the handbook was given to Ferraro at the time of hiring. That the signature of Ferraro to the handbook arguably was not affixed until August 6, 1980, is irrelevant to the issue here, for it is undisputed that the signature of Ferraro accepting the terms of Hyatt's handbook as conditions for continued employment antedated by at least six months the incident that led to the discharge. Thus, the issue posed by Hyatt in the court of appeals that there was some special significance in the understanding of the parties on the date of hiring is specious unless it can be concluded that, once the hiring took place, no subsequent understanding

---

[4] It was because of this latter aspect of the cause of action that the jury was asked to determine the truth of the statements in the letters submitted to Hyatt by Koelsch and Jorgenson.

or contract could replace what Hyatt considers to be a simple employment at-will contract. That position is untenable as a matter of law.

Were the only evidentiary fact in the record the statement in the application dated April 18, 1980, "I agree that my employment may be terminated by this company at any time without liability . . . ," a good showing of an at-will employment relationship would be made. But that is not the end of the sequence of evidentiary facts. There was evidence which the jury could have believed, and did believe, that the handbook setting forth the conditions of employment and the employer's contractual agreement that it would discharge only for cause was delivered to Ferraro contemporaneously with his hiring. Because Ferraro specifically accepted the terms of the handbook, either in May of 1980 or on August 6, 1980, an employment contract was formed on one of those occasions on the basis of the handbook's offer and Ferraro's acceptance of its terms, in either event months prior to the incident of February 25, 1981.

We need not linger over whether or not there was a contract by implication, a contract which ripened into an enforceable one by performance, or became a contract on the basis of some other theory whereby the reasonable expectations of the parties will be enforced by a court. Here there was an express contract replete with stated consideration—the promise of employment on stated terms and conditions by Hyatt and the promise by Ferraro to continue employment under those conditions. It is black letter law that a promise for a promise, or the exchange of promises, will constitute consideration to support any contract of this bilateral nature. *First Wisconsin National Bank of Milwaukee v. Oby,* 52 Wis. 2d 1, 7, 188 N.W.2d 454 (1971) ; *see also,* Restatement 2d *Contracts,* sec. 75 (1981).

That this was an abrogation of an at-will relationship, if such were originally intended, is clear from the language of the handbook. For example, the Hyatt Corporation promised that, in the events of layoffs, any layoff "will be based on your seniority." Moreover, the Hyatt Corporation differentiated between those employees still within a probationary period and those who were not and provided a different process for discharging employees in the different groups. If all employees were "at will" employees, these provisions would not have been necessary. All employees could have been dischargeable at the whim of the employer, subject to the unusual public policy considerations that may occasionally arise and which were explained in *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983). Clearly, some sort of tenure dichotomy between probationary and regular employees was contemplated in the employment contract.

As pointed out above, the handbook, whose conditions were accepted, set up a hierarchy of rules the infraction of which could lead to discharge, with the promise that an employee would be *entitled* to different treatment depending upon the type of alleged misconduct and, most importantly, that a discharge would only be for "just cause."

As Nightingale said at the trial, the handbook stated what the company would do for the employee and what it expected the employee to do for it. The handbook was thus characterized by Hyatt's executive manager as a document by which each party made promises to the other in the expectation that the promises would be kept and the agreement to keep them would be binding.

- The above is a summary of the promises explicitly made by Hyatt in the handbook which the jury found was proffered to Ferraro at the time of hiring. In exchange for these promises what did Ferraro promise

that would cause the acceptance of this document to ripen into an enforceable employment contract? Most significantly, he expressly stated after the acknowledgment of having received and read the Hyatt Regency Milwaukee employees' handbook, "Furthermore, I understand the policies and rules and *accept them as a condition of my continued employment.*" (Emphasis supplied.)

In addition, there were other express promises elicited from the employee as a condition of employment. Ferraro agreed that, unless there were special circumstances of exoneration approved by his supervisor, he would give a two-week notice before leaving Hyatt's employment. The handbook indicated that failure to do so would affect the Hyatt Corporation's appraisal of the employee's work record. Clearly, the obligation to give notice prior to leaving was a promise that inured directly to the benefit of the employer.

To question whether an employees' handbook containing express promises by the employer, which handbook asks an employee for express responsive promises, can in Wisconsin ripen into something other than an employment relationship terminable at will is like asking whether contracts will be enforced in this state. The basic question is not one of policy, but of law, mandated by the United States Constitution—will an express contract be enforced. To ask the question is to answer it.

The court of appeals did not take the position that this state's policy favoring employment terminable at will was so strong that it would never countenance an agreement that purported to establish a different employment relationship. What it did, however, was to hold, correctly we believe, that in light of that policy it would not by implication *alone* convert a handbook produced by an employer for the guidance and orientation of employees into an express contract. It found

an express statement by Ferraro in the unilateral application for employment that the employment could be terminated without liability except for wages earned to the date of termination. It did not look to the transaction in the instant case to determine whether there was an express contract of a different nature between the parties.

The court of appeals erred when it looked to the generic nature of employees' handbooks rather than to scrutinize the handbook here. While the court of appeals properly could conclude that the mere issuance of a guidebook for an employee does not suffice to change the nature of the relationship, in the instant case it failed to examine the nature of the handbook here.

Here, whatever the original relationship between the parties—and it is apparent that if no other evidence were available than that in the original application for employment, the relationship would be "at will"—the promises in the handbook, coupled with the return promises of the employee Ferraro, resulted in an express contract incorporating all the provisions thought desirable by the employer in respect to obligations of the employee, misconduct, and employee discipline and discharge.

We are confident that, had the court of appeals considered it necessary to examine the terms of the contract, it would agree that in this case there was an express contract that had the effect of supplanting an at-will employment, had such relationship ever been entered into.

Hyatt has placed reliance upon language of this court in *Forrer v. Sears, Roebuck & Co.*, 36 Wis. 2d 388, 153 N.W.2d 587 (1967), a cause which was brought under the theory of promissory estoppel, not contract.

*Forrer* correctly states the law applicable to the lawsuit where it was applied, but *Forrer* pointed out (at 394) that the plaintiff there consciously elected not to proceed on a contract theory. We did say, in dicta however, that the complaint would have failed in contract also because there was no evidence of the employee furnishing any additional consideration.

*Forrer* specifically recognized that, while silence would be interpreted to create a contract terminable at will, that result would not obtain if "the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other." (At 393) Thus, *Forrer* stood for the proposition that an at-will contract could not exist in the face of the parties' express intention to bind each other to a different relationship.

In the instant case there is not only additional consideration as demonstrated above, but there was an expressed intent to bind one another in a relationship that was not an at-will employment contract.[5]

---

[5] C. Bakaly and J. Grossman write, in *Modern Law of Employment Contracts* (1984 Supp.) 27–28:

"In contract law, a promise is enforceable because something has been given for it. Consideration is that 'something' which has been promised or given.

"That 'something' need not be very much. The general rule is that any benefit to the promisee or detriment to the promisor, no matter how economically inadequate, will support a promise. For this reason, adequacy of consideration is rarely an issue in employment contracts. . . .

"It is also the rule that several promises can be supported by a single and undivided consideration as long as the consideration would support each promise separately. Thus, an employee's work or promise to work will be adequate consideration for an employer's promises to pay a certain wage, to provide a bonus, to provide a pension plan, or to provide any other fringe benefit. . . .

"Although consideration is not generally an issue in the formation of employment contracts, it can become important should

It should be emphasized that we hold only that the particular personnel manual used by Hyatt here, containing the conditions it did and which were specifically accepted by Ferraro and under which conditions he agreed to continue work, constituted a contract for something other than an employment contract terminable at will. An at-will contract may be modified by a personnel manual, but we do not hold that all personnel manuals or employee handbooks will have that effect.

Thus, we conclude in respect to this aspect of the case that, as a matter of law, an employment contract can be modified by the use of an employees' handbook and, in the instant case, the jury, on the basis of credible evidence, correctly found that Annunzio Ferraro and Hyatt agreed to be bound by the provisions in the em-

---

the parties attempt to modify their agreement. The problem arises from the legal doctrine known as the 'preexisting duty rule.' Under this rule when someone promises to do something he is already legally obligated to do, such a promise is not adequate consideration to support another party's promise. . . .

"Because an at-will employee is free to quit his job at any time, the preexisting duty rule will generally not create a problem if his employer promises him some added benefit. For instance, if an employer promises an at-will employee a salary increase or a bonus, the employee gives adequate consideration for the employer's promise by staying on the job. He has in effect given up his right to quit, at least temporarily. This detriment is sufficient consideration for the employer's promise of a raise or a bonus."

*See also*, J. Calamari and J. Perillo, *The Law of Contracts* 33 (1970); Note, *Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate only in Good Faith*, 93 Harv. L. Rev. 1816, 1819 (1980); *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 629 (Minn. 1983); *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 462, 443 N.E.2d 441 (1982); *Pugh v. See's Candies, Inc.*, 116 Cal. App. 3d 311, 326, 171 Cal. Rptr. 917 (1981).

ployees' handbook relating to conditions of employment, misconduct, and discharge of employees.

While agreeing with the jury that there was credible evidence to support the jury's verdict that the parties agreed to be bound by the provisions in the handbook, we part company with the jury in its finding that the evidence demonstrated that Hyatt's discharge procedures violated those required in the handbook.

The test of this portion of the verdict is the same as that applied above. Was there any credible evidence to support the verdict? Although our duty is to search the record for credible evidence to sustain the verdict,[6] our search fails to produce any such evidence. Accordingly, that portion of the verdict must be set aside. The evidence, whose credibility is not subject to doubt, is entirely to the contrary.

Hyatt in its contract bound itself to discharge only for "just cause," and then only after two warnings had been given—except in cases of severe rule violations, and in any case only after investigation.

There is no evidence to support a finding that these contractual rules were not adhered to. The credible evidence totally supports Hyatt's position that the misconduct was a severe rule violation constituting just cause for firing without further warnings and which was investigated prior to discharge.

The facts show that the underlying offense was verbally hassling and physically assaulting Koelsch in the parking lot and then continuing the verbal abuse in the night manager's office. These facts were contained in the statements of Koelsch and Jorgenson, which the jury found to be true.

Do these facts, which have been proved, constitute "just cause" for dismissal and are they of a nature that

---

[6] *Coryell v. Conn,* 88 Wis. 2d 310, 317, 276 N.W.2d 723 (1979).

constitute so "severe a rule violation" that dismissal may be without prior warnings? It is not argued that the misconduct, if proved, was not just cause for discharge if the evidence of misconduct had been investigated when the Hyatt Corporation made its firing decision. Rule 6 lists types of conduct that are not only typified as "Just Causes for Dismissal," but also are of such a serious nature that dismissal can be immediate, *i.e.*, without prior warning or opportunity to correct one's ways. Included conduct in that rule is:

"6. Disrespectful conduct . . . fighting on hotel premises; coercion, intimidations or threats of any kind against guests . . . using vulgarity . . . ."

The jury found as factual the statements of Koelsch and Jorgenson. There is no doubt that the conduct as proved was sufficient evidence of just cause for discharge—without any prior warning, as provided for in the contract. There are no facts in the record that could lead to a reasonable inference that the firing was for other than just cause. The cause of action that there was bad faith involved was dismissed and the jury chose to believe the statements of Koelsch and Jorgenson, not the statements of those who disputed the basic facts of the February 25, 1981, altercation.

Ferraro argues that the cause was not just, because immediately after the incident and after confronting Ferraro and Koelsch, Behrendt, his immediate supervisor, did not reach the decision to fire Ferraro. The reasoning therefore seems to be that, if the facts revealed contemporaneously with the original complaint were not sufficient for firing, some other unrevealed and insufficient reason must have impelled the firing. There is no evidence at all to support that hypothesis.

Moreover, Behrendt was not the ultimate authority; he was the night manager. It was after the original com-

plaint to Behrendt that the higher echelons of Hyatt received the letters of Koelsch and Jorgenson detailing the events of February 25. The fact that there was not a firing forthwith is not relevant to the question of whether the firing was for just cause when it finally occurred.

While almost three weeks elapsed from the time of the parking-lot complaint to the time of firing, the record shows that a series of conferences about the incident were held by Hyatt managers. There is no reason to believe, as Ferraro would have us believe, that the three-week period was so attenuated that firing was for some other intervening and unrevealed cause. Ferraro's suspicion is not supported by any evidence. The record is replete with evidence of Ferraro's misconduct on February 25, 1981. It is replete with evidence that the parking-lot incident was the reason for Ferraro's discharge. The assault on Koelsch constituted just cause for discharge.

In view of the nature of the disrespectful conduct and the physical assault upon a guest, it is fatuous in light of Rule 6 for Ferraro to assert that this is a trivial type of misconduct or a minor nonconformity to the rules that requires a third offense of the same nature before there can be a discharge.

Because the record demonstrates a "severe rule violation" for which, under the contract provisions of the handbook, no warning is needed, there was no contractual necessity for Hyatt to tolerate similar misconduct on two more occasions before firing. There is no credible evidence to support a jury finding to the contrary.

Hyatt undertook yet another obligation when it entered into its employment contract with Ferraro—the duty to conduct a pre-termination investigation. There is no credible evidence that it defaulted in that respect.

The evidence is undisputed that Hyatt officials interviewed Ferraro, Koelsch, and the adjacent parking-lot attendant immediately after the incident. The written statements of Koelsch and Jorgenson were in Hyatt's hands prior to Ferraro's discharge. The Koelsch letter to the national president of Hyatt was dated February 26, 1981, and a copy was sent to the resident manager of Hyatt in Milwaukee on the same day. Jorgenson's letter dated March 2, 1981, was sent directly to the resident manager in Milwaukee. There is no credible evidence that would have supported a finding that there was a failure by Hyatt to conduct an investigation as required in the handbook.

The jury, nevertheless, found that Hyatt's procedure violated the rules set forth in the handbook that was the basis of the employment contract. We conclude, however, that there was no credible evidence upon which a reasonable jury could base such a finding. There was no credible evidence upon which a jury could find that Hyatt failed in its obligation to discharge only for cause and only after investigation. No facts in the record could lead to the inference that the misconduct was not serious and, hence, was of a type that required multiple warnings prior to termination. There is no credible evidence to support a jury's finding that any of the contractual rules of employment were violated by Hyatt.

Because we conclude that there was a contract of employment specifically entered into between Ferraro and Hyatt, which Ferraro breached, and because there is no credible evidence that Hyatt did not observe and follow the contract rules for just-cause discharge, Ferraro, though not an employee at will, has no right of recovery for wrongful discharge.

Although we arrive at the conclusion that Ferraro cannot recover against Hyatt by a different rationale

than that used by the court of appeals, our decision in respect to the outcome of this case is the same. Ferraro may not recover.

We agree with the trial court's conclusion that in Wisconsin an employees' handbook may modify an at-will contract, and under the facts of this case, where its terms were specifically accepted by the employee, it did. We diverge from the trial court's judgment, because we find the jury's finding that Hyatt violated the contractual rules for firing to be without the support of any credible evidence.

In conclusion, then, we hold that there was sufficient evidence to support a finding that the parties by an express contract intended to modify an at-will employment relationship, which Ferraro breached, but there was no evidence to support the jury's finding that Hyatt violated that employment contract.

*By the Court.*—Decision affirmed.