Phillip W. OLSON, and Randal F. Konichek, Plaintiffs-Appellants,†

v.

3M COMPANY, Maynard Schultz, City of Prairie Du Chien, Prairie Du Chien Police Department, Gary R. Knickerbocker, Terry J. Zinkle, and Hartford Insurance Group (ITT Hartford), Defendants-Respondents.

Court of Appeals

*No. 93–2418. Submitted on briefs August 11, 1994.—Decided September 29, 1994.*

(Also reported in 523 N.W.2d 578.)

†Petition to review denied.

26

For the plaintiffs-appellants the cause was submitted on the briefs of *Robert J. Gingras* and *Paul A. Kinne* of *Gingras Law Office, S.C.* of Madison.

For the defendants-respondents, 3M Company and Maynard Schultz, the cause was submitted on the brief of *Marko J. Mrkonich* of *Oppenheimer Wolff & Donnelly* of St. Paul, Minnesota.

For the defendants-respondents, City of Prairie Du Chien, Prairie Du Chien Police Department, Gary R. Knickerbocker, Terry J. Zinkle and Hartford Insurance Group (ITT Hartford), the cause was submitted on the brief of *Harry Sauthoff, Jr.* of *LaRowe, Gerlach & Roy, S.C.* of Madison.

Before Eich, C.J., Gartzke, P.J., and Vergeront, J.

VERGERONT, J. Phillip Olson and Randal Konichek appeal from a summary judgment dismissing their claims of defamation, breach of employment contract and conspiracy in violation of § 134.01, STATS. The trial court granted summary judgment to their employer, 3M Company, and plant manager Maynard Schultz (the 3M defendants) on all three claims, and to the City of Prairie du Chien, its police department, two department employees, and the city's insurer (the municipal defendants) on the defamation and conspiracy claims. We affirm the dismissal of all three claims against all defendants, but as to the defamation claim against 3M, we affirm on a different basis than that relied on by the trial court. We conclude that 3M had a

privilege that it did not abuse to make the allegedly defamatory statements.

## BACKGROUND

3M employed Olson and Konichek on a production line at 3M's Prairie du Chien plant. It terminated their employment on February 14, 1991, after allegations of harassment, including sexual harassment, were made against them by a co-employee, Yong C. 3M and the Prairie du Chien Police Department each conducted investigations of the allegations. Each issued a press release the day after the terminations and Schultz and Police Chief Gary Knickerbocker each spoke to reporters. 3M's press release stated:

> An investigation by 3M into allegations of harassment at its Prairie du Chien, Wisconsin, plant resulted in the termination of two production employees and the resignation of two production employees Thursday. The Company launched the investigation last December immediately after it was notified of the alleged activities.
>
> "Our position is very clear: incidents of this nature simply are not tolerated at 3M facilities," said Prairie du Chien plant manager Maynard Schultz.
>
> Schultz added that all employees at Prairie du Chien had received training about 3M's policy prohibiting harassment of any type.
>
> Details of the circumstances leading to the terminations and resignations were not disclosed.
>
> 3M manufactures a wide variety of industrial and consumer products, and had sales in excess of $13 billion in 1990. The Prairie du Chien plant manufactures Scotch Brite brand cleaning products and Thinsulate brand insulation, and employs 660 people.

The police department's press release stated:

On January 28, 1991 the Prairie du Chien Police Department received a complaint of possible employee assaults and harassment at the Prairie du Chien 3M Company.

After a lengthy investigation was conducted, it was disclosed that several 3M employees were victims of harassment and assaults by other employees at the Prairie du Chien plant.

Several of the victims are seeking medical attention stemming from the harassment and assaults. The investigation was initiated by one of the employees who is alleged to be involved in the actions against the victims.

The case is being referred to the Crawford County District Attorney for review for possible charges stemming from the investigation.

Chief Gary Knickerbocker commends the cooperation of 3M Officials and employees in bringing the case to a quick resolution, and to the 3M Officials for their assistance to the victims. The Chief also commends the Police Officers involved in the lengthy investigation.

No criminal charges were brought against Olson and Konichek.

Olson and Konichek's complaint alleged claims of breach of contract against 3M; tortious interference with contract against the municipal defendants; and defamation, civil conspiracy, and conspiracy under § 134.01, STATS., against all defendants. They alleged that 3M and the municipal defendants had conspired in their investigations and in the issuance of the press releases, and that the press releases and other statements made by Schultz and Knickerbocker were unprivileged, false and defamatory.

The trial court found the press releases and statements made to the press were substantially true. It did not reach the issue of 3M's privilege but held that the municipal defendants were immune from suit under § 893.80(4), STATS. It dismissed the conspiracy claims on the ground that Olson and Konichek's submissions raised no factual dispute as to the adequacy of the investigations. It dismissed the breach of contract and tortious interference with contract claims because Olson's and Konichek's contracts with 3M were "at will," and if 3M needed "proper cause" to terminate them, 3M had shown it.

In reviewing a grant of summary judgment, we apply the same standard as the trial court, and we follow the methodology set forth in *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987).

## DEFAMATION CLAIM AGAINST 3M

We conclude that 3M had a conditional privilege, which it did not abuse, to issue the press release and make the statements to its employees and the press. We therefore need not decide whether the trial court erred in finding that 3M's press release and statements made to its employees and to the press were substantially true.

Defamatory conduct otherwise actionable may escape liability because the defendant acts in furtherance of an interest of social importance—an interest that is entitled to protection even at the expense of uncompensated harm to the plaintiff. *Zinda v. Louisiana Pac. Corp.*, 149 Wis. 2d 913, 921-22, 440 N.W.2d 548, 552 (1989). A defamatory statement is condition-

36

ally privileged if it is "made on a subject matter in which the person making the statement and the person to whom it is made have a legitimate common interest." *Id.* at 922, 440 N.W.2d at 552. The *Zinda* court held that the common interest privilege attaches to an employer's communication to its employees that it had terminated an employee for falsification of employment forms. The employer had an interest "in informing each and every one of its employees about the subject of [the] discharge." *Id.* at 927, 440 N.W.2d at 554.

██

We conclude that 3M had an interest in common with its employees in maintaining a work environment free of harassment, including sexual harassment. Indeed, under federal and state law 3M has a duty to do so.[1] In addition, 3M has a policy defining harassment and sexual harassment, and providing that all employees are entitled to a harassment-free environment and that complaints will be promptly investigated.[2] That common interest includes reasonable communications by 3M to its employees concerning action taken against employees for harassment. 3M has an interest in discouraging harassment and reassuring employees concerned about harassment that 3M takes the policy seriously. 3M's employees have an interest in knowing

---

[1] *See* 42 U.S.C. § 2000e *et seq.*; 29 C.F.R. § 1604.11; § 111.36 (1)(b), STATS.

[2] The policy defines "harassment" as "verbal or physical conduct . . . which creates an intimidating, hostile, or offensive work environment." "Sexual harassment" is defined to include "any unwanted or unwelcome attention or action of a sexual nature when . . . the conduct unreasonably interferes with an employee's job performance, or the conduct creates an intimidating, hostile, or offensive work environment."

that the harassment policy is enforced and how it is enforced.

A conditional privilege is forfeited if it is abused in any of these ways:

> (1) [D]efendant . . . [had] knowledge or reckless disregard as to the falsity of the defamatory matter; (2) [T]he defamatory matter is published for some purpose other than that for which the particular privilege is given; (3) [T]he publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege; (4) [T]he publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged; or (5) [T]he publication includes unprivileged matter as well as privileged matter.

*Zinda* , 149 Wis. 2d at 925, 440 N.W.2d at 553 (citations omitted) (footnote omitted) (citing RESTATEMENT (SECOND) OF TORTS §§ 600-605A (1977)).

Olson and Konichek argue 3M abused its conditional privilege in that: (1) it recklessly disregarded the truth of the statements it made about Konichek and Olson; (2) it was motivated by the desire to maintain federal contracts and limit its liability to Yong C.; and (3) it published the information to a larger audience than necessary.

Because 3M had a conditional privilege, the burden shifts to the plaintiffs to affirmatively prove abuse of the privilege. *Zinda*, 149 Wis. 2d at 926, 440 N.W.2d at 554. At the summary judgment stage, this means that Olson and Konichek have the burden of showing that a genuine and material factual dispute exists on the abuse of privilege issue.

"Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement." RESTATEMENT (SECOND) OF TORTS § 600(a) cmt. b (1977). For purposes of our discussion, we assume without deciding that the statements were defamatory—that they conveyed the meaning that Olson and Konichek had engaged in harassment, including sexual harassment—and that the identities of Olson and Konichek were sufficiently ascertainable.[3] We turn first to the material the 3M defendants submitted to support their motion for summary judgment. Taken together, they assert the following.

In December 1990, Konichek complained to 3M production manager Stu Bosworth that Yong C.'s husband had demanded that he quit harassing Yong C. Bosworth took Konichek to Paul Ginkel, 3M's human resources manager. Konichek told Ginkel about the demand. Ginkel talked to Yong C. two days later. Yong C. told Ginkel that there was a bet that someone—she did not name who at the time—would get her into bed in thirty days, and that someone on the crew had spread her legs and said something to others such as "come and get it." Because Yong C. became distraught while relating these incidents, Ginkel discontinued the interview and arranged for her interview by Karen Eichman, 3M's employee assistance counselor. That interview took place in early January.

Ginkel brought Byron Nesheim from 3M's human resources department at its Minnesota headquarters into the investigation. In early January, Nesheim and

---

[3] "Defamatory words are not libelous unless they refer to an ascertained or ascertainable person." *Ogren v. Employers Reinsurance Corp.*, 119 Wis. 2d 379, 382, 350 N.W.2d 725, 727 (Ct. App. 1984).

Ginkel interviewed the managers and members of Olson and Konichek's crew, including Olson and Konichek. Subsequently, Susan Hafner, from 3M's security services department, became involved in the investigation. Hafner and Nesheim conducted another round of interviews with Olson and Konichek and about one dozen 3M crew members, managers and former employees.

Nesheim and Hafner interviewed Yong C. on January 23. She said that Konichek: in front of other crew members, pulled her legs apart and said "make our wish come true"; spread rumors that he and Yong C. had sex together; forcibly spread her legs while sticking out his tongue in a licking motion; told her he wanted a "blow job"; put his hand down her blouse; and committed many other inappropriate acts and gestures toward her. Yong C. said that Olson: asked her to perform a strip tease for money; offered to wash her back if she would wash his; told her to move to Las Vegas where she could work as a prostitute and he could be her pimp; asked her for a "quickie"; grabbed his crotch and moved toward her while Konichek held her legs apart; told her that he liked Asian women because they are "tighter" than American women; and subjected her to other harassing conduct. Yong C. also alleged harassment and unwanted touching by other co-employees.

On January 28, Yong C. filed a formal written complaint with the Prairie du Chien Police Department against Olson, Konichek and other individuals alleging sexual assault and harassment. Terry Zinkle, assistant chief and captain of the department, interviewed her and began an investigation.

Between January 31 and February 4, Hafner and Nesheim interviewed about 18 people, including Olson

and Konichek. Olson and Konichek were interviewed a total of three times. They corroborated certain aspects of Yong C.'s accounts and denied others. Other crew members corroborated certain of Yong C.'s accusations against Konichek and Olson. Hafner and Nesheim doubted Olson's and Konichek's credibility because the two men initially denied allegations that they later admitted.

On February 5 and 7, Hafner and Nesheim met with a number of 3M human resources and employee relations personnel, and 3M general counsel to report their findings. Schultz recommended that 3M seek resignations from Olson, Konichek and two other individuals, and that if they did not resign, they should be discharged immediately. The others present agreed with his recommendation.

We now examine the submissions of Olson and Konichek in opposition to 3M's motion for summary judgment. Konichek's affidavit states that on many occasions Yong C. engaged him in several discussions of a sexual nature, and his affidavit details some of them. Because she brought up such topics, on occasion he had conversations of a nonthreatening nature with her. She dressed provocatively. She invited several male co-workers to her residence to go swimming and made it clear her husband would not be home and only men were invited. She also gave ginseng to him and Olson, telling them it would make them horny. He describes a conflict he had with Yong C. in October 1990, regarding her work performance, and another incident on December 16, 1990, when he became irritated with her for a work-related reason. He believes the October incident made her vindictive toward him. He describes the interviews with the 3M investigators, and states he told them he was not a party to any bet

about sleeping with Yong C. and had never done anything sexual to her. He felt 3M was not interested in Yong C.'s conduct.

Olson's affidavit describes the pool invitation, the ginseng incident and numerous occasions on which Yong C. engaged him in conversations about sex. He states she never complained about the sexual content of their conversations and was a willing participant. He describes the interviews with the 3M investigators. He denied to them, in response to specific questions, that he had ever sexually harassed anyone and denied the specific accusations he was told Yong C. had made. Like Konichek, Olson felt the investigators were not interested in Yong C.'s conduct.

The affidavits of other employees describe Yong C.'s provocative dress, conversations of a sexual nature she initiated, incidents involving two other male employees that the affiants describe as inappropriate touching and consensual kissing by Yong C., and statements attributed to Yong C. to show she was fabricating the accusations to get money and because of jealousy. Some, but not all, of this information was brought to the attention of 3M management.

Olson's and Konichek's submissions do not dispute the extent of the investigation conducted by 3M, and they largely corroborate 3M's account of the information that it gathered during the investigation. This distinguishes *Calero v. Del Chem. Corp.*, 68 Wis. 2d 487, 228 N.W.2d 737 (1975), on which Olson and Konichek rely. In *Calero*, the employer made no attempt to investigate the charges. *Id.* at 508, 228 N.W.2d at 749.

Faced with a large amount of information from numerous employees, much of it conflicting, 3M had to make credibility determinations to decide whether its

harassment policy was violated. 3M retains its conditional privilege even if it disbelieved Olson and Konichek, rejected their definition of harassment, and did not speak to everyone who might have had negative things to say about Yong C. To retain its conditional privilege, all that is required is that 3M not act with reckless disregard of the truth in making statements about Konichek's and Olson's conduct. The record, including all reasonable inferences drawn in Olson and Konichek's favor, does not reveal a genuine dispute of material fact on this issue. Nothing supports Olson and Konichek's contention that 3M's investigation was a sham.

■

The summary judgment submissions do not reveal a factual dispute concerning 3M's motive or purpose. According to Ginkel, 3M was concerned about potential liability to Yong C. 3M knew that if sexual harassment had occurred, there would be a potential for termination of 3M's contracts with the federal government. This evidence is insufficient, as a matter of law, to establish an improper motive or purpose on the part of 3M such that it forfeits its conditional privilege.

We now examine whether 3M abused its conditional privilege by publishing statements about Olson's and Konichek's terminations to persons not reasonably believed to be necessary for the accomplishment of the purpose supporting the privilege. RESTATEMENT (SECOND) OF TORTS § 605 (1977).

■

It is undisputed that 3M told the line supervisors and members of the day and night production crews that two employees were terminated and two resigned because of the investigation, and that it posted the press release at the plant. Although 3M did not identify

Olson and Konichek in these communications (or in the press release), we accept as true Olson and Konichek's claim that 3M employees knew who was terminated. However, since 3M had a privilege to inform "each and every one of its employees about the subject of [Olson's and Konichek's] discharge," *Zinda*, 149 Wis. 2d at 927, 440 N.W.2d at 554, 3M could, with impunity, have named Olson and Konichek in its communications with its employees. No abuse of privilege occurred simply because the employees knew 3M was referring to Olson and Konichek.

Olson and Konichek argue that 3M abused its conditional privilege because its communications to the media, through the press release and Schultz's remarks to reporters, were excessive. 3M responds that it had a privilege to communicate the results of the investigation to the community for these reasons: (1) rumors about the investigation were circulating throughout Prairie du Chien; (2) the local press had asked 3M about the investigation before the investigation was completed and it had become clear that a Prairie du Chien newspaper would be writing a news article on the topic; and (3) 3M wanted to inform the community that its investigation was over, appropriate action had been taken, and harassment at 3M is not tolerated. Olson and Konichek do not dispute that there was knowledge throughout Prairie du Chien about the investigation. Indeed, in support of the argument that their identities were ascertainable from the press release, Olson and Konichek point to the undisputed fact that 3M employs 660 people in Prairie du Chien, which has a population of 5,000 to 6,000.

Before deciding whether 3M's communication to the community abused its conditional privilege, we

44

must first decide whether a conditional privilege exists for that communication. Whether a conditional privilege attaches to a particular occasion is a question of law. RESTATEMENT (SECOND) OF TORTS § 619(1) cmt. a (1977). Wisconsin courts have not decided whether a conditional privilege attaches to an employer's communication to the community concerning employee terminations. However, at least two other jurisdictions have held it does.

In *Richmond v. Southwire Co.*, 980 F.2d 518 (8th Cir. 1992), the major employer in a small town, in response to inquiries from local newspapers, read a prepared statement that said that it had investigated the use of controlled substances by its employees and twenty-five unnamed employees were terminated for violations of company policies. The court held that a qualified privilege to publish a defamatory statement in good faith to protect one's own interest applied to a small town employer's explanation to local media of the results of a newsworthy investigation into employee dishonesty or misconduct. *Id.* at 520. In *Straitwell v. Nat'l Steel Corp.*, 869 F.2d 248 (4th Cir. 1989), a company issued a press release on the results of its investigation into allegations of employee misconduct to the news media of the town in which the company was located and surrounding communities. The release stated that the results justified termination of the unnamed employees. Because of the size of the employer relative to the community and the employer's legitimate desire to preserve community trust, the court found the press release did not abuse the company's conditional privilege.

██

These decisions persuade us. The Wisconsin Supreme Court has recognized a conditional privilege

to publish a defamatory statement where the communication affects a sufficiently important interest of the publisher and the recipient's knowledge of the defamatory matter will be of service in the lawful protection of that interest. *Converters Equip. Corp. v. Condes Corp.*, 80 Wis. 2d 257, 264, 258 N.W.2d 712, 715-16 (1977). It is undisputed that many in the Prairie du Chien community knew of the harassment investigation. 3M had an important interest in letting the community know that it took seriously its obligation to provide a harassment-free work place. Communication to the community on the results of the investigation and the actions 3M had taken served to protect that interest. We conclude that a conditional privilege attaches to 3M's communications to the community.

The abuse of a conditional privilege is for the fact finder to decide if there are disputed facts or competing reasonable inferences to be drawn from undisputed facts. But where "the facts are such that only one conclusion can reasonably be drawn," the court properly makes this determination. RESTATEMENT (SECOND) OF TORTS § 619(2) cmt. b (1977). No facts on this record, and no reasonable inferences from those facts, show 3M abused its conditional privilege to communicate to the community.

Olson and Konichek argue that 3M abused its conditional privilege to communicate to the community because it included defamatory matter not reasonably believed to be necessary to accomplish the purpose that occasioned the privilege. Specifically, they argue that 3M accused them of "intolerable acts and sexual assault." The reference to "intolerable acts" apparently refers to the statement in the press release that "incidents of this nature simply are not tolerated at 3M

46

facilities." This statement is within 3M's privilege. The reference to "sexual assault" is apparently a reference to this statement in one of the newspaper articles submitted by Olson and Konichek:[4] "Two male workers were fired and two more resigned at a 3M factory following an investigation into sexual assault and harassment accusations, the company said." It is undisputed that there were accusations of sexual assault against one of the employees who resigned. This statement is an accurate description in general terms of the accusations. Assuming Schultz or another 3M employee made this statement, it does not abuse 3M's privilege.

Olson and Konichek also argue that 3M abused its privilege to communicate to the community because persons in the community knew who had been fired. We have already held that 3M had a privilege, that it did not abuse, to tell its employees about the terminations. 3M does not forfeit its privilege to communicate to the community because news of who had been fired spread outside the plant.

## DEFAMATION CLAIM AGAINST THE MUNICIPAL DEFENDANTS

The trial court granted summary judgment to the municipal defendants on the defamation claim on two grounds: the substantial truth of their statements and immunity under § 893.80(4), STATS.[5] We do not reach

---

[4] The articles are not attached to any affidavit or deposition. However, the defendants have not objected to our consideration of these articles.

[5] Section 893.80(4), STATS. provides:

No suit may be brought against any . . . [political] corporation, [governmental] subdivision or agency . . . or against its officers,

the first ground because we conclude the municipal defendants are entitled to summary judgment on their defense that they are immune from suit under § 893.80(4).

Section 893.80(4), STATS., grants immunity from suit to municipalities and their officers, agents and employees for "quasi-judicial" and "quasi-legislative" acts. The terms "quasi-judicial" and "quasi-legislative" as used in § 893.80(4) are synonymous with the term "discretionary" as used in the common law rule of immunity for a public officer. *Scarpaci v. Milwaukee County*, 96 Wis. 2d 663, 683, 292 N.W.2d 816, 826 (1980).

We turn to the depositions of Zinkle, Knickerbocker and 3M personnel to determine whether the municipal defendants have made a *prima facie* case for immunity from suit. According to these depositions, Zinkle conducted an investigation of the complaint Yong C. filed with the police department. During his investigation, he interviewed 3M employees. 3M permitted its employees to be interviewed at the police station during paid work time. No witnesses were interviewed in the presence of a 3M official. Zinkle asked 3M to send him anything that would assist his investigation, and 3M forwarded to him copies of notes taken during its interviews with its employees. Zinkle sent 3M copies of his interview notes and statements he took. Hafner compared those notes to hers to check for inconsistencies.

When Zinkle completed the investigation, he recommended that Konichek and Olson not be criminally charged or, at most, be charged with a Class B forfei-

officials, agents or employes for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

48

ture. He recommended that one of the other individuals be charged with second-degree sexual assault and another possibly with fourth-degree sexual assault. The police department sent the results of the investigation, along with its recommendation, to the district attorney.

It is the department's policy to issue a press release at the completion of an investigation when it has generated public interest. This one had. Zinkle drafted a press release with Officer Knickerbocker. There were at least two conversations between 3M personnel and Zinkle concerning the issuance, timing, and contents of the department's press release and 3M's press release. The police department retained its press release but made it available to reporters. Knickerbocker told reporters that one woman was hospitalized for apparent mental problems, all of the accused were men, and the incidents took place on the production line. The articles submitted by Olson and Konichek attribute to Knickerbocker statements that improper touching is considered fourth-degree sexual assault, several victims were seeking counseling as a result of the incidents, and incidents of improper touching and verbal sexual harassment had been going on for a long time.

We conclude that this evidence makes out a *prima facie* case that the municipal defendants are entitled to immunity from suit on the defamation claim because their decisions were discretionary. Olson and Konichek do not point to any factual material that disputes this testimony. Rather, they argue that this testimony shows that Knickerbocker and Zinkle acted outside their jurisdiction. We find no merit to this contention.

There is "a distinction between those acts which are outside the officer's jurisdiction or authority and those acts which constitute negligence or a mistake of judgment within the officer's lawful jurisdiction." *Scarpaci*, 96 Wis. 2d at 692, 292 N.W.2d at 830. In the former there is no immunity, in the latter there is. *Id.* If a nonjudicial public officer is authorized in the exercise of his or her judgment and discretion to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of the public officer's authority, there is no liability for negligence or other error in making that decision. *Maynard v. City of Madison*, 101 Wis. 2d 273, 281, 304 N.W.2d 163, 168 (Ct. App. 1981).

The investigation of a formal written complaint filed with the police department is within the authority of police officers. Whom to interview, what contacts to make with other entities that might have relevant information, and the focus and scope of the investigation are decisions requiring judgment and discretion. There is no evidence that Knickerbocker and Zinkle "acted effectively as 3M employees" or "concoct[ed] evidence," as Konichek and Olson assert. Similarly, when to issue a press release or talk to the media, and what information to divulge, are decisions requiring discretion and judgment on the part of officers within their lawful authority. Neither the press release nor Knickerbocker's statements to the press identify Konichek or Olson by name. Evidence that readers of the press release and news articles knew Konichek and Olson had been terminated by 3M as a result of 3M's investigation does not show that the press release and statements to the press were outside the authority or jurisdiction of the officers.

50

■■■

Konichek and Olson also argue that Zinkle and Knickerbocker acted with malice and in bad faith in issuing the press release when, in Zinkle's view, Konichek and Olson were essentially cleared of "any criminal misdoings." We disagree. Zinkle and Knickerbocker do not determine whether charges should be brought. That is the decision of the district attorney, as the department press release made clear. The issuance of a press release at the close of an investigation is department policy. There is no evidence that the investigation did not disclose that several 3M employees were victims of harassment and assaults by other employees at the Prairie du Chien plant, as the press release stated. At least two employees besides Konichek and Olson were the subject of the investigation, and Konichek and Olson do not dispute the investigation's results as to those two.

## CONSPIRACY UNDER § 134.01, STATS.

Section 134.01, STATS., makes it unlawful to conspire "for the purpose of wilfully or maliciously injuring another in his or her reputation, trade, business or profession . . . ."

■■■

As evidence of a conspiracy to injure them, Konichek and Olson point to the contacts between 3M and the police department in the investigations and the issuance of the press releases, and the inadequacy of both investigations. The undisputed facts are that 3M conducted an investigation concerning allegations of harassment at 3M, which resulted in the terminations of Olson and Konichek, and that the police department conducted a separate criminal investigation that did not result in the bringing of any charges against them.

3M and the municipal defendants shared information and discussed their investigations and press releases on several occasions. These facts do not permit any reasonable inference that 3M and the municipal defendants acted together for the purpose of injuring Olson's and Konichek's "reputation, trade, business or profession."

## BREACH OF EMPLOYMENT CONTRACT

Olson and Konichek's breach of contract claim depends on their assertion that the terms of a 3M employee handbook altered their at-will employment status and created a contract of employment. 3M breached this contract, they contend, by discharging them without "proper cause." Olson and Konichek have failed to show there is any genuine factual dispute on this issue, and we conclude that 3M's employee handbook did not convert the at-will employment relationship into one that could only be terminated for proper cause.

The 3M employee handbook states that it is designed "to help you become familiar with many of the Company policies as they apply to you" and that "[w]e hope you will read and keep your manual as a handy reference for any questions which you may have now or in the future." The handbook also states that "[f]rom time-to-time, there may be changes in policies or conditions, but you will be notified, as soon as possible, of the changes affecting you."

Under a section entitled "Seniority," the handbook provides:

**Termination of Seniority**

Seniority and employment will automatically terminate for any of the following reasons:

1. Voluntary resignation

2. Termination or discharge for proper cause.

3. Failure of an employee to notify the Company of his/her intention to return to work within two (2) workdays . . . .

4. Layoff from the plant for a continuous period of time . . . .

5. Absence for two successive workdays without proper notification . . . .

6. Absence from work for any reason in excess of a two year period . . . .

Under a section entitled "Employee Responsibilities," the handbook states:

**Guide to Conduct**

This pamphlet outlines the policies and guidelines which experience has shown to be most effective in maintaining sound working relationships. When an employee's conduct is not in accord with the GUIDE, CORRECTIVE ACTION MAY BE REQUIRED. It is the policy of 3M, before taking action, to examine each case individually, considering the nature of the violation, the past record, and the service of the employee involved.

The handbook then lists a number of plant rules, violations of which "can result in corrective action up to and including discharge."

Employment is generally terminable at will by either party without cause. *Clay v. Horton Mfg. Co., Inc.*, 172 Wis. 2d 349, 354, 493 N.W.2d 379, 381 (Ct. App. 1992). An employee handbook may modify an at-will employment relationship. *Ferraro v. Koelsch*, 124 Wis. 2d 154, 169, 368 N.W.2d 666, 674 (1985). In light

of Wisconsin's policy favoring employment at will, the mere issuance of an employee handbook for guidance and orientation of employees is insufficient to alter an at-will employment relationship. *Id*. Rather, the at-will relationship is altered only if the handbook contains express provisions from which it reasonably could be inferred that the parties intended to bind each other to a different relationship. *Bantz v. Montgomery Estates, Inc.*, 163 Wis. 2d 973, 979, 473 N.W.2d 506, 508 (Ct. App. 1991).

In *Ferraro*, the company handbook: (1) provided different processes for discharging probationary and "regular" employees; (2) set out a hierarchy of rules, the infraction of which could lead to discharge; (3) promised that employees would be entitled to different treatment depending upon the type of alleged misconduct; and (4) promised that employees would not be discharged without just cause. *Ferraro*, 124 Wis. 2d at 165, 368 N.W.2d at 672. The court found there was an expressed intent to abrogate an at-will employment relationship.

In contrast to the facts in *Ferraro*, the 3M employee handbook has no provision from which it can reasonably be concluded that the parties intended to bind each other to something other than an at-will employment relationship. The handbook does not provide different processes for discharging probationary and "regular" employees. Although the handbook lists a number of plant rules that could result in discharge if violated, it does not set out a hierarchy of rules or a schedule of increasing discipline for each rule violation. The handbook states that before taking action, 3M's policy is to examine each case individually, with consideration given to the nature of the violation and the employee's past record and service, but it does not set

out a procedure for discharging an employee or promise that employees will only be discharged for just or proper cause.

The employee handbook does provide that seniority and employment will automatically terminate for, among other reasons, "Termination or discharge for proper cause." However, this provision is located in the "seniority" section. When read in context, this provision states only that an employee's position in the 3M seniority system automatically ends when an employee is terminated for proper cause. This section does not state that employees may only be discharged for proper cause, and it would be unreasonable to draw such an inference.

Finally, the provision allowing the employer to unilaterally change the terms of the handbook without prior notice is directly at odds with the contention that the handbook created a contractual relationship that could only be terminated by adherence to the contract's terms. *See e.g. Bantz*, 163 Wis. 2d at 981, 473 N.W.2d at 509.

We conclude that the handbook does not permit a reasonable inference that an employee may only be discharged for proper cause. Therefore, Olson's and Konichek's testimony that they thought they could only be fired for "proper cause" does not create a genuine issue of material fact. There is no testimony they were ever told that by 3M management; they rely solely on the handbook for the basis of a contract with 3M. For the same reason, Schultz's testimony about his understanding of 3M's policies is insufficient to raise a genuine factual issue as to whether the handbook altered the at-will employment relationship.

Because Olson and Konichek had no contract with 3M, they have no claim against 3M for breach of contract, regardless of whether 3M had proper cause to terminate them. We therefore do not reach the issue of whether proper cause existed.

*By the Court.*—Judgment affirmed.