# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 01-2014

ROBERT HUDSON,

*Plaintiff-Appellant,*

*v.*

CHICAGO TRANSIT AUTHORITY,
a municipal corporation,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 4124—**John W. Darrah**, *Judge.*

———————

ARGUED OCTOBER 24, 2003—DECIDED JULY 9, 2004

———————

Before BAUER, EASTERBROOK, and RIPPLE, *Circuit Judges.*

BAUER, *Circuit Judge.* Robert Hudson filed suit against the Chicago Transit Authority on July 7, 1998, alleging breach of contract, retaliation and racial discrimination. Fourteen counts of his twenty-count complaint are Title VII discrimination and retaliation claims based on promotions given to other CTA employees that Hudson thought he deserved. The remaining six counts are based on allegations that the CTA breached a 1995 settlement agreement that settled a prior discrimination suit brought by Hudson. The district court granted CTA summary judgment for all of

Hudson's claims except for two of his breach of contract claims. The court then dismissed those remaining two claims for lack of jurisdiction. Hudson appeals the court's order granting the CTA summary judgment on his claims. We affirm.

## BACKGROUND

Hudson was hired by the CTA as an electrician in February 1977. In September 1995, Hudson settled a lawsuit with the CTA. The lawsuit claimed racial discrimination and retaliation by the CTA. The settlement agreement provided, in part, that Hudson would be placed into a new position titled "Maintenance Construction Material Coordinator." The agreement stated that:

> CTA shall use reasonable efforts to afford to Mr. Hudson the same rights, privileges and opportunities afforded to all other Coordinators. Such rights, privileges and opportunities are not absolute, and Mr. Hudson is not automatically entitled to identical treatment as every other Coordinator . . . . As a coordinator, Mr. Hudson shall rotate into the Manager's position.

The Plaintiff, employed at the CTA's West Shops facility, filed a suit claiming that the CTA discriminated against him again because he is African-American and retaliated against him for filing the prior discrimination suit. His new claims arose out of promotions given to certain Caucasian CTA employees in 1997 and 1998 at the CTA's West Shops facility.

### I.  Manager Rail Customer Facilities Projects

Plaintiff claims he was denied eight different promotions for four different positions in 1997 and 1998: Manager Rail Customer Facilities Projects; Manager Rail Customer

Facilities Maintenance; General Maintenance Manager; and Senior Coordinator. Three of the promotions that the Plaintiff complains of went to Caucasian males for the position of Manager Rails Customer Facilities Projects or simply called Project Manager. One of these positions was not posted, but was filled directly by Jack Hartman, Senior Vice President of Facilities Management and Engineering. The other two positions were posted and the Plaintiff applied for just one of those.

### A.  Mike Kelly's Promotion

Hartman promoted Mike Kelly to the position of Project Manager directly. The CTA does not require postings be made for all job vacancies in management positions. For this particular position, a posting was not required by the CTA's Human Resources Department. At the time of his promotion, Kelly had been an electrician at the CTA for 23 years. According to Hartman, Kelly proved he was worthy of a promotion by his hard work and initiative. Hartman became familiar with Kelly's work during the months prior to Kelly's promotion because Kelly worked with a team of employees who were assigned to improve the appearance and state of repair of the CTA's facilities as part of the Neighborhood Station Improvement Program, ("NSIP"). Hartman was particularly impressed that Kelly put in long hours and worked on weekends. For instance, Kelly created a user's manual for the CTA's power washers to address problems with washers that often broke down because of frequent misuse. Kelly had also previously acted as Senior Coordinator of the CTA's emergency response crews that responded to emergencies involving CTA buses, trains, and other equipment and facilities.

### B. Tom Drozd's Promotion

The second Project Manager position was posted in April 1997. Forty-seven employees applied for the position. Eleven applicants were chosen for interviews, including the Plaintiff. Hartman conducted the interviews and all interviewees were asked the same questions that had been approved in advance by the Human Resources Department.

Hartman chose Tom Drozd for this Project Manager position. Drozd spent two years at Washburn Trade school in the 1970s and had been a sheet metal worker since the mid-1980s. Like Kelly, Hartman had the chance to observe Drozd on other occasions. He believed he was a self-starter who had proved his good work ethic on previous assignments. Hartman was also impressed that Drozd had rehabilitated a building with over 60 apartment units as a side job and refinished a boat. Based on the interview, Hartman concluded that while Hudson was suitable, he was not recommended for the position. Hartman thought that Drozd had a drive that was not exhibited by the other applicants, including Hudson.

### C. Mike Harjung's Promotion

In 1998, Kelly retired and the CTA posted the Project Manager position again. Hudson chose not to apply. The salary set for the position by Human Resources was less than the amount Hudson was earning at the time. The promotion went to Mike Harjung. Harjung, before his promotion, worked as a Coordinator over bricklayers, carpenters, maintenance repairmen and flagmen doing special projects. One of the first projects Harjung worked on at the CTA was cleaning the subway rights-of-way, including the subway sewers. Harjung had a background in plumbing and worked previously for the City of Chicago Water Department.

In the spring of 1998, Harjung demonstrated his problem-solving skills by repairing a sewer in front of the CTA's West Shops facility in just two days, even though others had been trying to fix it for a month. Based on his experience and good reputation for being a hard worker, plus an unsolicited recommendation from the Deputy Commissioner of the City of Chicago Water Department, the interviewers believed Harjung to be more than qualified for the position.

## II. Manager Rail Customer Facilities Maintenance: George Grecco's Promotion

Hudson also complains about the promotion of George Grecco, a Caucasian male, to the position of Manager Rail Customer Facilities Maintenance ("Manager Rail Facilities"). Hudson did not apply for the position although it was posted in the spring of 1997. The posting summarized the responsibilities for the position as follows: "assists the General Manager in development and administration of department's programs, policies and goals, administers discipline to janitors and responds to grievances." Hudson did not apply for this position because he did not want to supervise janitors even though the posting listed references to responsibilities beyond the supervision of janitors. Hudson also admits that he did not have the special training required for electricians who repaired elevators and escalators.

## III. General Maintenance Manager: John Johnson's Promotion

John Johnson was promoted to the position of General Maintenance Manager. This position was not posted and from the briefs it is unclear who conducted the interviews. CTA believes that the recommendations and interviews were handled by an African-American, Randy Simmons,

who is now deceased. The promotion was approved by George Haenisch, who was Vice President at West Shops. Johnson had over twenty years of experience at the CTA and had previously worked as a machinist in the fabricated parts group and as Senior Coordinator in the Utility Repair Section, where he supervised tradesmen in utilities. Haenisch believed that Johnson's responsibilities as Senior Coordinator involved a lot of supervision of tradesmen and that Johnson did that job well. Haenisch testified that the tradesmen at West Shops and at the Utility Repair Section may have different work but are capable of transferring between the two areas.

## IV. Senior Coordinator Positions

In February 1998, a single posting was made for a Senior Coordinator Electrical Construction position and three Senior Coordinator Construction positions. Hudson applied for the Senior Coordinator positions and was interviewed once for all four positions by Vice President Patrick Harney and David Cargill, the General Manager of West Shops. During the interview, Hudson gave only one-word answers to questions and did not elaborate on how he would improve CTA operations. Cargill believed that Hudson lacked the supervisory experience necessary for the job because he had never acted as a foreman or leader at the CTA. Hudson was not recommended for any of the four positions. A Caucasian male was chosen for the Senior Coordinator Electrical Construction position. The three Senior Coordinator Construction positions went to an African-American male and two Caucasian males. Hudson does not complain about the offer made to the African-American male.

## DISCUSSION

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on

file, together with affidavits, if any, show that there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c). We view all evidence and the reasonable inferences in the light most favorable to the nonmoving party. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). However, the nonmoving party must come forward with specific facts that show there is a genuine issue for trial. *Id.* We conduct a de novo review of the district court's order granting summary judgment.

### A. Title VII Racial Discrimination and Retaliation Claims: Grecco and Harjung

The district court held that Hudson failed to establish a prima facie case for discrimination and retaliation arising from the Grecco and Harjung promotions; we agree with the district court. If a plaintiff does not apply for a job vacancy that is posted, he cannot make a prima facie case for unlawful discrimination or retaliation under Title VII unless the plaintiff demonstrates that the employer's discriminatory practices deterred plaintiff from applying. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (requiring a showing that plaintiff applied for the job as an element of a prima facie case in a failure to promote case); *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003) (holding that a plaintiff in a failure to promote context must show that he applied for and was rejected for the promotion to establish an adverse action).

So Hudson failed to meet the standards required under the law to establish a prima facie case for discrimination and retaliation based on the Grecco and Harjung promotions. He admits that he was aware of the job postings, but decided not to submit an application for either promotion. Hudson presented no evidence that he was prevented from applying. He knew of the Spring 1997 promotion that went to Grecco and specifically decided not to apply for the

position because he believed that it exclusively involved the supervision of janitors. Although Hudson asserts that the posting for the Grecco promotion was misleading, he fails to point to any facts that suggest the CTA intentionally made the posting misleading to keep him from applying. After reading the job description, the district court concluded the job description was not misleading; we agree.[1] "[A]dministers discipline to janitors" is the only duty listed among the four in the description that references janitors, debunking Hudson's assertion that the description is focused on supervising janitors. The notice for the Spring 1998 position, that went to Harjung, was posted outside Hudson's office for weeks and he has not claimed that he was prevented from applying for that position. Hudson's argument that his prior applications were sufficient to show interest in the positions that went to Grecco and Harjung is not supported by law. It was not obvious to anyone at the CTA that Hudson was interested in these positions. Accordingly, the district court's order granting summary judgement on Hudson's discrimination and retaliation claims based on the Grecco and Harjung promotions are affirmed.

*B.  Retaliation Claims*

The Plaintiff also challenges the district court's order granting summary judgment on his retaliation claims. The district court held that Hudson never established a prima facie case for unlawful retaliation because he failed to establish any direct evidence of retaliatory motive on the part of the decision-makers. He also failed to show evidence

---

[1]  The posting summarized the responsibilities for the position as follows: "assists the General Manager in development and administration of department's programs, policies and goals, administers discipline to janitors and responds to grievances."

that other similarly situated employees who had not filed a claim against the CTA were treated more favorably than the Plaintiff.

In *Stone v. City of Indianapolis Public Util. Div.*, we clarified the standards for summary judgment on Title VII unlawful retaliation claims. 281 F.3d 640, 644 (7th Cir. 2002). In *Stone*, we laid out two distinct ways for a plaintiff to establish a prima facie case for unlawful retaliation to avoid summary judgment in favor of the employer. The first way "is to present direct evidence (evidence that establishes without resort to inference from circumstantial evidence) that [plaintiff] engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains." *Id.* The second way requires that a plaintiff establish that, after filing a charge, the plaintiff was subjected to an adverse employment action even though he was performing his job satisfactorily and no similarly situated employee who did not file a charge was subjected to the adverse employment action.[2] *Id.* Even where the plaintiff establishes all of the required elements to make out a prima facie case, if the employer presents unrebutted evidence of a non-invidious reason for the employment action at issue, the employer is entitled to summary judgment unless there is a material issue of fact as to whether the employer's non-invidious reason is pretext

---

[2] This second avenue is adapted from the analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McDonnell Douglas* sets out a burden-shifting test where the plaintiff must first establish a prima facie case by the preponderance of the evidence and then the employer must come forward with evidence of a legitimate, nondiscriminatory reason for its actions. If the employer meets this requirement, the burden shifts back to the plaintiff to demonstrate, again, by a preponderance of the evidence, that the reasons proffered by the employer are actually a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 805.

for retaliation. *Id.* In the instant case, Hudson failed to establish a prima facie case for retaliation under any test set forth in *Stone*.

We held in *Stone* that inferences and circumstantial evidence cannot be used to establish a prima facie case for retaliation under the direct evidence test. 281 F.3d at 644. Here, the record reveals no direct evidence of retaliation and Hudson's assertions that CTA violated the 1995 settlement agreement—his transfer to work under Mary Ward, few opportunities to rotate, lack of job duties—do not constitute direct evidence of retaliation.

Hudson also argues that certain comments made by individuals in the promotion process serve as direct evidence of retaliation. However, Hudson failed to tie those comments to the promotion decisions at issue. These statements were made during depositions taken a year after the promotions were made. For instance, when Hudson deposed Hartman, counsel asked him whether he had "negative feelings" for the Plaintiff. Hartman responded that he had "negative feelings in that [Hudson] should work harder if he wants to get ahead." Br. of Defendant-Appellee at 33. Hartman did not know the Plaintiff at the time of the promotion and knew nothing of the lawsuit. Hartman's comment, and the others the Plaintiff cites, are not like those at issue in our recent decision in *Ajayi v. Aramark Bus Servs.*, 336 F.3d 520 (7th Cir. 2003). In that case, comments made by decision- makers before or near the time they make a challenged employment decision were held to be sufficient to sustain a plaintiff's discrimination claims. The comments made in this case were far removed from the decisions concerning the promotions.

The Plaintiff relies on *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2002) and *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990), to support his direct evidence argument. In *Reeves*, the comments at issue were direct comments that the plaintiff was too old to do his job. 530 U.S. at 151. *Shager* also involved direct comments made by

the supervisor who recommended the plaintiff's termination because plaintiff was too old. 913 F.2d at 400. The comments at issue in *Shager* and *Reeves* were made before the employment decisions were made. And, both used the indirect method set forth in *McDonnell Douglas*.

The Plaintiff also failed to establish the elements required under the indirect method of proving retaliation. In order to establish a prima facie case for retaliation using indirect evidence, the plaintiff must show the following: (1) after filing a charge plaintiff was subject to adverse employment action; (2) at the time, plaintiff was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. *Stone*, 281 F.3d at 644. Under the indirect method of proof, failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (finding that summary judgment in favor of the employer was proper because plaintiff failed to establish an adverse employment action).

The Plaintiff fails to point to any evidence in the record to demonstrate that he was singled out and that other similarly situated employees who did not file a charge of discrimination against the CTA were treated more favorably. *See Johnson v. Cambridge Indus.*, 325 F.3d 892, 899 (7th Cir. 2003) (holding that plaintiff failed to make a prima facie case on failure to promote claim because he could not prove that similarly situated employee who did not file claim was treated more favorably).

To determine whether employees are similarly situated for the purposes of analyzing a Title VII retaliation claim, the employees must be "directly comparable in all material respects." *Ajayi*, 336 F.3d at 531-532 *(*quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). For each of the promotions at issue there were other interested and qualified employees who were passed over

like the Plaintiff even though they had not filed claims against the CTA. Indeed, with respect to the Drozd promotion, forty-five other employees who applied in response to the posting were passed over. Also, other employees, who did not file charges against the CTA, lost their management positions because they were not performing up to Hartman's standards. Hudson has not demonstrated that the individuals who were promoted were similarly situated. Three of them were Senior Coordinators, which is a higher rank than the Plaintiff's position at the time they were promoted. No other evidence in the record supports a reasonable inference that the denials of promotions were motivated by retaliation. Therefore, the order granting the CTA summary judgment on Hudson's retaliation claims, Counts 2,4,6,8,16,18, and 20 are affirmed.

## C.  Remaining Discrimination Claims

The Plaintiff's remaining discrimination claims do not establish a material issue of fact as to whether the CTA's reasons for the promotions were pretext for discrimination. Under the indirect method of proving Title VII claims, once a plaintiff establishes a prima facie case by the preponderance of the evidence, the employer may articulate a non-invidious reason for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802. The plaintiff must then establish that there is an issue of material fact as to whether the employer's proffered reasons are merely pretext for unlawful discrimination or retaliation, in order to survive summary judgment. *Id.* at 804. Although intermediate burdens shift back and forth under the *McDonnell Douglas* framework, the ultimate burden of demonstrating that the defendant intentionally discriminated always remains with the plaintiff. *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (admonishing that at all times the Title VII plaintiff holds "the ultimate burden of persuasion").

In order to demonstrate a material issue of fact as to pretext, a plaintiff must show that either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible. *Guerrero v. Ashcroft*, 253 F.3d 309, 313 (7th Cir. 2001). Pretext is more than a mistake on the part of the employer; it is a phony excuse. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). Where a defendant has proffered more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons. *Id.* at 395. However, we do not "sit as a super-personnel department that reexamines an entity's business decisions." *Id.* at 396; quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986). Instead, we look to "whether the employer gave an honest explanation of its behavior." *Id. (*quoting *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987)).

In this case, the CTA can point to many legitimate reasons for their promotional decisions and there is no indication that these reasons were pretextual. In Hartman's deposition, he stated that he was looking to promote individuals who exhibited proactive qualities and who promised to "make changes" in the way things were run. R.34/Hartman Dep. 117. He made it clear that anyone who did not possess this work ethic, regardless of race, did not have a place in his management team. Two Caucasian managers in high ranking positions, Cargill and Haenisch, did not perform to these standards and eventually left the CTA. R. 34/Pl. Dep. 53, Hartman Dep. 18-19, 147. Three African-American employees who met CTA's standard—Pierce, Jenkins and Baker—were promoted. R. 44/Jenkins Aff.¶2; Pl. Dep. 58, Maloney Dep. 25. There was also a statistical analysis conducted in late 1997 that demonstrated that African-Americans were not under-represented in management positions in Hudson's department. Supp. App. at 1-4.

In addition, different managers at the CTA made decisions for each of the promotions at issue. In each instance, the decision maker testified to legitimate, non-discriminatory reasons for his decision. The Plaintiff failed to present evidence that the proffered reasons were pretextual.

As discussed above, the employees who were promoted exhibited flexibility and dedication that fit Hartman's goal of changing the way things were done at West Shops and the improvement of CTA's facilities and service. These qualities were related to the necessary qualifications for management positions at West Shops. As we have long held, we will not second-guess the decision-makers' business judgment.

The Plaintiff contends that the CTA's explanations for the promotions at issue "fail the established test for pretext" and that the CTA must point to specific deficiencies in his qualifications. He misconstrues the *McDonnell Douglas* test as shifting the burden of persuasion onto an employer to establish lack of pretext; the ultimate burden of persuasion always remains on the plaintiff to show that the employer intentionally discriminated against the plaintiff. *St. Mary's Honor Ctr.*, 509 U.S. at 511. The *McDonnell Douglas* test merely shifts the burden of production to the employer to produce evidence of non-discriminatory reasons for the challenged conduct. Once the defendant has made such a showing, and for the reasons set forth above, the CTA has, the plaintiff has the burden of establishing pretext.

Hudson has failed to establish a material issue of fact as to whether the CTA's reasons for the promotions at issue are pretext for unlawful discrimination or retaliation. His entire pretext argument is based on his assertion that he was more qualified than the Caucasian males who were promoted. We ruled in *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002), that where a plaintiff in a promotional denial case relies solely upon a gap in credentials between

himself and the successful candidates, the gap must be so substantial at "slap you in the face." *Id.* at 1179. Based on the record before us, the Plaintiff has not established a triable issue as to whether the CTA's reasons for promoting others were illegal. Even if the CTA decision-makers made the wrong decision with regard to the more qualified employee, Hudson still would need to show that the stated reasons were lies, offered to cover their discriminatory motives. Hudson has not presented evidence that meets that challenge; summary judgment on the remaining discrimination claims is affirmed.

### D.  Breach of Contract Claims

The only breach of contract claim that Hudson appeals is the district court's grant of summary judgment on Count 13 for breach of contract based on the denial of the right to rotate into a manager position. The court below properly granted summary judgment because Hudson cannot show that the CTA breached a 1995 settlement agreement.

The 1995 settlement provided in pertinent part:

> CTA shall use reasonable efforts to afford Mr. Hudson the same rights, privileges and opportunities as afforded to all other Coordinators. Such rights, privileges and opportunities are not absolute and Mr. Hudson is not automatically entitled to identical treatment as every other Coordinator as such is impractical for a number of reasons. . . . As coordinator, Mr. Hudson shall rotate into the Manager's position.

Br. Defendant-Appellee/App. at 33. At the CTA, when a Vice President, General Manager, or Manager is away from work, a lower level employee may substitute for them or rotate into the job on a temporary basis. Each Vice President, General Manager, or Manager sets his or her own policy on when rotation will occur and who should do the rotation.

Hudson does not dispute that from September 1995 through Spring 1998, he rotated into his manager's position four or five times. The district court properly held that the settlement agreement did not establish a minimum number of rotations to which Hudson was entitled.

He was then transferred in March 1988 to a position that did not require a rotation—to work under Mary Ward, Manager of Administration, who was in charge of the CTA's computerized maintenance system. Hudson contends that under Ward he was made to be "a clerical worker and that his chances for 'rotation' were systematically and completely destroyed because the regulations did not allow Hudson to rotate for anyone else." Br. of Plaintiff-Appellant at 45.

The Plaintiff offers no evidence to demonstrate that there were other opportunities for him to rotate which were unreasonably denied or that there were even opportunities for him to rotate into Ward's position (e.g., Ward was on vacation or sick). There is also no language in the settlement agreement that says he must be transferred to a position that requires a manager rotation opportunity. There is no evidence that the CTA's decisions not to rotate were done to thwart Hudson.

For the reason set forth above, we AFFIRM the district court's grant of summary judgment in favor of the Defendant, the CTA.

No. 01-2014                                                    17

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*