Stanley YOUNG, Plaintiff,

v.

NAKOMA GOLF CLUB and James Grasse, Defendants.

No. 05–C–174–C.

United States District Court, W.D. Wisconsin.

Jan. 31, 2006.

Willie J. Nunnery, for Plaintiff.

Stephen M. Compton, Thorpe, Compton & Christian, S.C., Delavan, WI, for Defendants.

## OPINION and ORDER

CRABB, District Judge.

This is a civil action for monetary relief under 42 U.S.C. § 1981 in which plaintiff Stanley Young contends that defendants Nakoma Golf Club and James Grasse terminated his employment with the club because of his race. Defendants deny that they discriminated against plaintiff and contend that he was fired because of excessive absences. Jurisdiction is present. 28 U.S.C. § 1331.

This case is presently before the court on defendants' motion for summary judgment. For the reasons stated below, defendants' motion will be granted. Although plaintiff has made a fairly persuasive case that defendant Nakoma was contractually obligated to follow its progressive discipline policy in dealing with plaintiff's repeated absences, defendants are entitled to summary judgment because plaintiff entered into an oral agreement to settle this case with defendants and he has shown no reason to set that agreement aside. Further, plaintiff has failed to establish a prima facie case of discrimination under the burden shifting method set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

From the parties' proposed findings of fact, I find the following to be material and undisputed.

## UNDISPUTED FACTS

Plaintiff Stanley Young is an African–American residing in Dane County, Wisconsin. Defendant Nakoma Golf Club (Nakoma) was incorporated as a member-

owned private club in 1944. At all times relevant to this action, defendant James Grasse was employed by defendant Nakoma as a chef and supervisor of prep and banquet cooks. Lawrence Avery has been employed as defendant Nakoma's general manager for nearly ten years.

### A. *Defendant Nakoma's Employment Policies*

On August 21, 2002, defendants hired plaintiff as a full-time prep and banquet cook. On August 29, plaintiff signed a document entitled "New Employee Orientation Checklist," in which he acknowledged having received instruction concerning defendants' policies and procedures in a variety of areas, including absenteeism, tardiness, call-in policy, discipline and termination. Also, he signed a document entitled "Employment Understanding," in which he acknowledged receipt of defendant Nakoma's employee handbook and agreed to abide by all of defendant Nakoma's rules and regulations. Defendant Nakoma requires all of its employees to sign an "Employment Understanding."

The employee handbook defines defendant Nakoma's expectations with respect to its employees. It states that "regular, prompt attendance for all scheduled shift [sic] is very important. Tardiness and quitting early are equally wrong and will result in disciplinary action." Defendant Nakoma's disciplinary procedure, as set out in the handbook, provides that

> Abuse or neglect of the Regulations in this Handbook will result in the following actions: 1st Warning: Verbal; 2nd Warning: Verbal; 3rd Warning: Written—suspension (at the discretion of the supervisor); and 4th Warning: Written—termination.

Defendant Nakoma uses employee warning notices to document disciplinary infractions. The issuance of an employee warning notice is consistent with various progressive disciplinary policies identified in the handbook. The policy, practice and procedure is to fill out the employee warning notice form when a supervisor gives a verbal or written notice. Supervisors are required to complete an employee warning notice for a verbal or written infraction. After an employee warning notice has been written, the employee is given an opportunity to review it with the supervisor and sign it. The notice is placed in the employee's personnel file, which should contain all written employee warning notices for the employee.

According to the handbook, absenteeism is considered an infraction that does not warrant immediate discharge; poor performance and productivity may result in discharge but not immediate discharge. The handbook requires that a written warning be issued to an employee who arrives late or does not show up for work and does not call.

### B. *Plaintiff's Termination*

At some point, defendant Grasse told Avery that defendant Grasse was having problems with plaintiff's attendance, that he could not count on plaintiff and that he wanted to fire him. Avery and defendant Grasse met in the chef's office. No one else was present. The information received by Avery was verbal in nature. Avery consented to plaintiff's termination without looking at any objective data or documents in plaintiff's personnel file. Plaintiff's file contained no warning notices. He was never given any written warnings. Defendant Grasse never wrote up any notice of disciplinary warnings for absenteeism and never disciplined plaintiff for not performing his duties in an acceptable manner.

Defendant Nakoma terminated plaintiff's employment on April 15, 2003. Avery, defendant Grasse and Ken Gleed made the decision to terminate plaintiff's employment. The major reason for plain-

tiff's termination was his absenteeism. A document entitled "Employee Termination Notice" noted that the cause for plaintiff's termination was "poor performance and/or productivity" and "absenteeism." In the comments section of the notice, defendant Grasse wrote that plaintiff "was dismissed after repeated calls in from an unidentified woman telling me [plaintiff] was going to miss work." Similarly, a form entitled "Payroll Status Change" that accompanied the termination notice stated that plaintiff was discharged because of "multiple excuses for missing work; unable to perform job to [the] standard set for him."

### C. *Other Disciplined Employees*

#### 1. *Lindsay Pagel*

Lindsay Pagel is white. She received and signed defendant's "Employment Understanding" document on October 1, 2002. She received employee warning notices on October 20, 2002, November 19, 2002, February 1, 2003, May 4, 2003 and May 13, 2003. The first warning was for being late and not calling to notify her supervisor that she would be late. Tony Avoles wrote Pagel's third warning on February 1, 2003; it was accompanied by a suspension. Pagel received a fourth warning on May 4, 2003 and another warning on May 13, 2003 for not working her scheduled shift on May 11, 2003. She received a termination notice on May 13, 2003.

#### 2. *Jamie Schad*

Jamie Schad's employment application is dated April 27, 2003. She missed work without calling 21 times from July 11 to August 2, 2003. She was issued a termination notice on August 5, 2003.

#### 3. *Kelly Johns*

Kelly Johns received a termination notice dated August 21, 2003.

#### 4. *Tim Brockert*

Tim Brockert received an employee warning notice dated March 24, 2001. The notice was a second warning. His personnel file contained another undated document that was also a disciplinary notice. He was terminated for absenteeism on May 30, 2001. He was the only white employee terminated for absenteeism before plaintiff was terminated.

#### 5. *Francisco Gutierrez*

Francisco Gutierrez received a first employee warning notice on July 26, 2001. He received another employee warning notice dated September 1, 2001 and a third notice for repeated tardiness on September 7, 2001. The September 7 notice warned Gutierrez that if the behavior continued he would be sent home without pay. Defendant Grasse terminated Francisco Gutierrez's employment on October 12, 2001.

#### 6. *Manuel Jaime*

Manuel Jaime, who is Hispanic, had an employee warning notice dated February 24, 2005. It was marked as a first and second verbal warning. Also, he had an employee warning signed by Avoles and dated September 25, 2004 that indicated a verbal warning. He had another employee warning notice signed by Avoles and a notice signed by Alana Wagner on July 15, 2005. Avoles terminated Jaime's employment on February 26, 2005.

#### 7. *Morgan Reed Manchester*

Morgan Reed Manchester, who is of Caucasian descent, was hired on May 7, 2002 and discharged on December 30, 2002. He received a warning notice on October 5, 2002 in which he was warned about being drunk at work. The notice stated that he had been sent home on October 4, 2002 and told that if it hap-

pened again, he would be "released from work permanently." Defendant Nakoma's handbook indicates that intoxication will result in the immediate discharge of an employee. Manchester violated the intoxication policy and received a verbal warning from defendant Grasse.

### D. Proceedings before the Madison Equal Opportunities Commission

On August 25, 2003, plaintiff filed a discrimination complaint against defendant Nakoma with the Madison Equal Opportunities Commission. In the complaint, plaintiff alleged that defendant had violated section 3.23 of the Madison General Ordinances with respect to the terms, conditions and termination of plaintiff's employment because of his race and color. When defendant Nakoma received plaintiff's complaint, Avery asked defendant Grasse to compile a list of plaintiff's infractions. Defendant Grasse recalled plaintiff's infractions from memory and produced a document entitled "Stanley Young—Review of Time of Employment." Avery filed defendant Nakoma's response on October 17, 2003.

On January 27, 2004, Eric Kestin, an investigator and conciliator employed by the commission, issued an initial determination in which he found probable cause to believe that defendant Nakoma had discriminated against plaintiff in regard to the terms, conditions and termination of his employment because of his race and color. Kestin found no probable cause that defendant had discriminated against plaintiff with respect to compensation matters or in the denial of a job promotion.

On April 1, 2004, the commission sent plaintiff and defendants a notice informing them that a pre-hearing conference had been scheduled for April 27, 2004. The notice set out dates for discovery and a tentative hearing date. The pre-hearing conference was rescheduled for May 24, 2004. Defendants and their attorney appeared before the commission and plaintiff was contacted via telephone. The commission set out the issues to be determined and scheduled a hearing for September 14, 2004. The hearing date was changed to November 23, 2004 during a status conference held in July 2004. Defendants appeared in person with their attorney at this conference and plaintiff appeared by telephone because of a medical condition.

On at least three occasions before the final hearing, the parties attempted unsuccessfully to settle their case by speaking with David Lopez, a representative of the commission. On November 23, 2004, defendants appeared before the commission ready to proceed with the hearing. Before beginning the hearing, the commission instructed the parties to discuss the case with Lopez one more time. Accordingly, the parties met individually with Lopez and then together to discuss settlement. During the ensuing discussions, Avery directed defendants' attorney Stephen Compton to make an offer to settle the case for $5,000.00. Compton made the offer. After a significant period of discussion among Lopez, Compton and Avery, an agreement was reached whereby defendant Nakoma would pay plaintiff $5,000.00 in exchange for a full and final release of all claims against defendants. No issues concerning the settlement were left unresolved. The parties explained to the hearing examiner and Kestin that they had reached a settlement as to all issues in the case, including the amount of money that plaintiff would receive. Defendants were instructed to forward the necessary settlement documents and settlement check to Lopez. Defendant Grasse did not hear plaintiff say that he would accept the $5,000.00 or that he would sign documents in exchange for the release of any and all claims in the matter.

At some point, Compton prepared the release documents, enclosed a check for $5,000.00 payable to plaintiff and transferred them to commission representative Lopez. Throughout the process, plaintiff never informed defendants or their attorney that he needed an attorney to assist him in any way. He had proceeded by himself previously and had provided the necessary documents to the commission. On December 9, 2004, Compton received a letter from Willie J. Nunnery, a lawyer, stating that Nunnery represented plaintiff. In response, Compton set a letter to Nunnery informing him that the matter had been settled and that he should contact the commission if he had any further questions.

On December 14, 2004, Lopez sent a letter to the parties and their attorneys in which he stated that plaintiff had agreed to and accepted a settlement offer extended by defendants on November 23, 2004, that Lopez had received the settlement agreement on December 1, 2004, that Lopez called plaintiff on December 3, 2004 and left a message informing him that the settlement documents were available for his review and signature, that plaintiff had not responded to the message or to subsequent telephone calls and that since plaintiff had changed his mind and refused the settlement offer, Lopez was returning the settlement documents to defendants. Later, Compton received voicemail messages from Nunnery indicating that Nunnery did not believe the matter was settled and that Nunnery would be pursuing the claim through the commission or the Equal Employment Opportunity Commission. In response to these messages, Compton wrote another letter to Nunnery indicating that the case had been settled for a $5,000.00 payment in exchange for a full and final release of all claims brought by plaintiff. On December 13, 2004, Nunnery sent a letter to the Madison Equal Opportunities Commission, indicating that plaintiff had

"reaffirmed that he does not have a settlement with Nakoma Golf Club." On April 19, 2005, the commission issued a written decision denying defendants' motion to enforce an oral settlement. On March 25, 2005, while the matter was still pending before the commission, plaintiff filed his complaint in this court.

## DISCUSSION

### A. *42 U.S.C. § 1981*

Plaintiff brings his race discrimination claim under 42 U.S.C. § 1981, which provides that "all persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts." Section 1981 prohibits discrimination on the basis of race in the making and enforcing of contracts, including employment contracts. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). The Court of Appeals for the Seventh Circuit has held that discrimination claims brought under § 1981 should be analyzed under the same framework as claims under Title VII of the Civil Rights Act of 1964. *Patton v. Indianapolis Public School Board*, 276 F.3d 334, 338 (7th Cir. 2002) ("Discrimination claims under both Title VII and § 1981 are analyzed in the same manner."); *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir.2000) (using same framework to analyze claims under § 1981, § 1983 and Title VII). The parties agree that defendant Nakoma Golf Club is an employer for the purpose of the Civil Rights Act of 1964.

Plaintiff's theory of discrimination is that defendant Nakoma discriminated against him with respect to the terms and conditions of his employment contract. Specifically, he contends that the terms of the employee handbook were binding on defendant, that the handbook set out a progressive discipline policy and that de-

fendant Nakoma did not follow this policy when it terminated plaintiff's employment but did follow the policy when it disciplined other, non-black employees. Defendants argue that they are entitled to summary judgment because the parties entered into an oral agreement to settle this case on November 23, 2004 and plaintiff has not suggested any reason to set aside this agreement. I will discuss these arguments along with one other argument plaintiff advances in his response brief.

### B. Existence of Contractual Obligation

The thrust of plaintiff's claim is that defendant Nakoma's employee handbook and the "Employee Understanding" document are a contract that bound defendants to employ a progressive disciplinary policy. Plaintiff contends that defendants discriminated against him because they did not follow the policy when they terminated his employment. 42 U.S.C. § 1981(b) (prohibition on discrimination in making and enforcing of contracts includes discrimination with respect to "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship").

It is undisputed that plaintiff's file contained no employee warning notices and that defendant Grasse never gave plaintiff any written warnings for absenteeism. Therefore, the only question is whether defendant Nakoma was bound to use the progressive disciplinary policy in its employee handbook. Plaintiff cites no authority to support its argument that the rules in the employee handbook constituted terms of a contractual relationship between plaintiff and defendant Nakoma. Defendants cite *Mursch v. Van Dorn Co.,* 851 F.2d 990, 994 (7th Cir.1988), a diversity action in which the court of appeals, applying Wisconsin law, stated that an employee handbook does not convert an at-will employment relationship into a contractual relationship governed by the handbook's terms unless the handbook "contains express provisions from which the trier of fact may reasonably infer that the parties intended to bind each other in a different relationship."

■ Despite its age, *Mursch* continues to be an accurate statement of Wisconsin law. Wisconsin adheres to the at-will employment doctrine, under which an employer may terminate an employee at any time with or without good cause. *Wolf v. F & M Banks,* 193 Wis.2d 439, 449, 534 N.W.2d 877, 881 (Ct.App.1995). In *Ferraro v. Koelsch,* 124 Wis.2d 154, 368 N.W.2d 666 (1985), the Wisconsin Supreme Court held that an employee handbook may change an at-will employment relationship into one that is governed by the terms set out in the handbook. The court found that the Hyatt Corporation's employee handbook was "an express contract replete with stated consideration -the promise of employment on stated terms and conditions by Hyatt and the promise by Ferraro to continue employment under those conditions." *Id.* at 164, 368 N.W.2d at 671–72. Hyatt agreed that it would discharge non-probationary employees only for just cause; in return, Ferraro agreed to accept Hyatt's policies and rules as a condition of his continued employment and to give two weeks' notice before leaving employment.

■ In cases decided after *Ferraro* and *Mursch,* Wisconsin courts have held that a personnel manual will convert an at-will employment relationship into a contractual one only if it "contains express provisions from which it reasonably could be inferred that the parties intended to bind each other to a different relationship [from one that is at-will]." *Olson v. 3M Co.,* 188 Wis.2d 25, 54, 523 N.W.2d 578 (1994) (citing *Bantz v. Montgomery Estates, Inc.,* 163 Wis.2d 973, 979, 473 N.W.2d 506, 508 (Ct.App.1991)); *see also Helland v. Kurtis A. Froedtert Memorial Lutheran Hosp.,* 229 Wis.2d 751, 756, 601 N.W.2d 318 (1999)

(employee handbook did not create contract of employment; employer reserved right to take any disciplinary action against employees it deemed appropriate regardless of procedures in handbook and to modify handbook unilaterally and provided explicitly in handbook that it did not create any contractual rights).

Defendants argue that defendant Nakoma's employee handbook and the "Employment Understanding" document plaintiff signed do not reveal any intent to bind the parties to anything other than an at-will employment relationship. They cite the following language in the "Employment Understanding" document that plaintiff signed:

> I understand that by signing this statement, it is not a contract for personal services but its rather a statement of the Club's then existing policies and that, accordingly, I am not required to work for the Club for any set period of time. I further realize that my future job is directly related to my club's ability to compete, as well as to my performance on the job.

Dfts.' Reply Br., dkt. # 32, at 12. I will not consider this language because defendants never proposed it as fact. For his part, plaintiff has not highlighted any language in either the employee handbook or the "Employment Understanding" document that evidences defendant Nakoma's intent to be bound by the handbook's terms.

It is undisputed that, by signing the "Employment Understanding," plaintiff agreed to abide by defendant Nakoma's rules and regulations. Also, it is undisputed that defendant Nakoma's employee handbook states that tardiness and quitting early "will result in disciplinary action" and sets out a progressive discipline system which begins with verbal warnings and culminates in termination. The disciplinary procedure begins with statement that "Abuse or neglect of the Regulations in this Handbook *will result in the following actions.*" (Emphasis added). These terms are similar to terms that the Wisconsin Supreme Court relied on in finding that the handbook in *Ferraro* contained enforceable obligations. Plaintiff agreed to abide by defendant Nakoma's policies, and defendant agreed to impose a series of escalating sanctions for rules violations. Unlike the handbook in *Ferraro*, however, there is no indication that the handbook or the "Employment Understanding" document contained a statement identifying defendant's policies as conditions of plaintiff's employment. Nor is there any indication that defendant Nakoma promised not to terminate its employees without just cause. Resolution of this difficult question is unnecessary, however, because defendants have shown that they entered into an enforceable oral agreement to settle this case and plaintiff has shown no valid reason to set that agreement aside.

### C. *Oral Settlement Agreement*

■ Although employees may waive their right to sue under anti-discrimination statutes like Title VII, *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), they must do so knowingly and voluntarily. *Pierce v. Atchison, Topeka and Santa Fe Railway Co.*, 110 F.3d 431, 438 (7th Cir.1997). Agreements to settle discrimination claims and avoid litigation are enforceable under federal law even though not memorialized in writing. *Lyles v. Commercial Lovelace Motor Freight, Inc.*, 684 F.2d 501, 504 (7th Cir.1982). An oral agreement is a contract that requires a meeting of the minds as to the essential terms of the agreement and an intention by the parties to be bound. *Degerman v. S.C. Johnson & Son, Inc.*, 875 F.Supp. 560, 562 (E.D.Wis.1995). Like contracts, oral agreements are the result of an offer, an acceptance and consider-

ation. *Taylor v. Gordon Flesch Co. Inc.*, 793 F.2d 858, 862 (7th Cir.1986).

Defendants argue that the facts in this case are nearly identical to those in *Taylor*. In *Taylor*, 793 F.2d at 860, the plaintiff filed a charge of discrimination against his employer with the Madison Equal Opportunities Commission. Before the commission was scheduled to conduct a fact-finding conference, the plaintiff discussed his case with his attorney, who told him that his prospects for monetary recovery were not good. At the hearing the parties discussed settling the case. The employer's attorney proposed terms of a settlement; after consulting with his attorney, the plaintiff accepted the offer. The plaintiff's attorney prepared the initial draft of the settlement agreement and the plaintiff applied for unemployment compensation, in accordance with the terms of the agreement. After the plaintiff signed the initial draft, his attorney sent it to defendant's attorney, who made some stylistic changes and sent it back to the plaintiff's attorney. The plaintiff refused to sign the revised version. *Id.* at 861.

The court of appeals held that oral agreements to settle Title VII claims are enforceable and that the parties had entered into an enforceable oral contract, in particular because there was no dispute that the plaintiff had accepted the employer's oral offer during settlement negotiations. *Id.* at 862. The court stated further that the parties' inability to agree on written terms did not negate the existence of a binding agreement because no part of their oral agreement was conditioned on the existence of a written document containing the terms of the agreement. *Id.* Finally, the court stated that "a party to a settlement cannot avoid the agreement merely because he subsequently believes the settlement is insufficient." *Id.* at 863 (citing *Glass v. Rock Island Refining Corp.*, 788 F.2d 450 (7th Cir.1986)).

The present case is analogous to *Taylor* in all material respects. It is undisputed that the plaintiff and defendants engaged in settlement negotiations on November 23, 2004, shortly before their hearing before the Madison Equal Opportunities Commission was to begin. Further, it is undisputed that defendants' attorney made an offer to settle the case for $5,000.00. Most important, it is undisputed that the parties reached an agreement whereby plaintiff would waive any and all claims against defendants in exchange for a payment of $5,000.00. After reaching the agreement, the parties informed the hearing officer that they had settled the case. Soon after, defendants forwarded to commission representative Lopez a written memorialization of the agreement and a check payable to plaintiff. Only after the settlement had been reduced to writing did plaintiff voice any objection.

Plaintiff argues that a dispute of fact exists concerning whether the parties ever consummated a settlement agreement. He notes that Avery and Grasse have admitted that statements in their affidavits concerning the existence of a settlement agreement are incorrect or in conflict with deposition testimony. Therefore, he contends that "they have no credibility on this issue." Plt.'s Br., dkt. # 28, at 16. This argument is a red herring because defendants withdrew the affidavits of Grasse and Avery in a letter dated November 7, 2005. However those affidavits were not the only evidence defendants relied on to establish the existence of an enforceable agreement. Defendants cited the affidavit of Stephen Compton in support of their proposed findings concerning the existence of a settlement agreement. Plaintiff has not objected to Compton's affidavit or his ability to testify concerning the settlement negotiations that occurred on November 23, 2004. Because Compton was a participant in the negotiations and made the

settlement offer to plaintiff, he has personal knowledge about whether the parties reached an agreement. Fed.R.Civ.P. 56(e) (affidavits must be based on personal knowledge).

■ The undisputed facts indicate further that the settlement agreement reached by the parties satisfies the requirements for an enforceable oral agreement. Defendants' attorney made the offer and plaintiff accepted it. Plaintiff agreed to accept a payment of $5,000.00 in consideration for his waiver of any and all claims against defendants. The terms of the agreement were reasonably certain and reasonably ascertainable from the parties' words and actions. *Taylor,* 793 F.2d at 862. Moreover, defendants have established that plaintiff's acceptance was voluntary and knowing. The undisputed facts reveal that, before November 23, 2004, plaintiff had pursued his administrative grievance by himself and that the parties had engaged in at least three rounds of settlement negotiations. There is no indication that plaintiff was forced to accept the settlement against his will or that he was not aware of the terms of the agreement. Indeed, this appears to be a situation in which plaintiff decided that he did not like the terms of the agreement after he entered into it. *Glass* and *Taylor* do not allow plaintiff to repudiate the agreement merely because he believes, in hindsight, that he could have gotten a better deal.

Aside from plaintiff's failure to create a genuine issue of material fact regarding the existence of an oral agreement, other undisputed facts suggest that the parties reached an agreement. For example, defendants' attorney prepared release documents and a check for $5,000.00 payable to plaintiff after the November 23 meeting. This strongly suggests that an agreement was reached. Further, David Lopez's December 14, 2004 letter contained a summary of the status of plaintiff's administrative grievance. As part of that summary, Lopez noted that plaintiff had accepted the offer proposed by defendants on November 23, 2004. Plaintiff has made no effort to explain how defendants' attorney and Lopez could have gotten the mistaken impression that the parties had reached an agreement to settle the case.

Finally, plaintiff proposed as a fact that defendant Grasse did not hear plaintiff agree to settle his case for $5,000.00 or see him sign any documents in exchange for a full and final release of any and all claims arising out of his termination. Plt.'s Resp. to Dfts.' PFOF, dkt. # 29, at 37, ¶¶ 157–59. Even if this is true, it does not mean that the parties did not reach an agreement. Plaintiff's reliance on this proposed fact is undermined completely by his failure to dispute defendants' proposed finding that the parties reached a settlement agreement. Because this fact stands undisputed, and because plaintiff has not set forth any reason to set the agreement aside, his § 1981 claim is barred.

### D. *Merits of Plaintiff's Case*

■ Finally, I will address briefly plaintiff's contention that it has established a prima facie case of discrimination. Defendants contest this assertion in their reply brief. Because race discrimination claims under § 1981 are analyzed using standards developed under Title VII, I understand the parties to be invoking the burden shifting method set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Blise v. Antaramian,* 409 F.3d 861 (7th Cir.2005) (plaintiff may employ burden shifting method in § 1981 claim).

■ To survive summary judgment under *McDonnell Douglas,* a plaintiff has the initial burden to establish a prima facie case of discrimination. *Bio v. Federal Express Corp.,* 424 F.3d 593, 596 (7th Cir.

2005). If the plaintiff makes out a prima facie case, he is entitled to "a presumption that the employer unlawfully discriminated against the employee." *EEOC v. Our Lady of the Resurrection Medical Center*, 77 F.3d 145, 148 (7th Cir.1996) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Once the plaintiff has met this burden, defendant has the burden of rebutting the presumption by coming forward with a legitimate nondiscriminatory reason for the employment actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant satisfies this standard, the plaintiff must then demonstrate that there is a genuine issue of material fact about the honesty of the defendant's stated reason for plaintiff's termination. *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir.2004). Defendants are entitled to summary judgment unless plaintiff introduces evidence from which a reasonable jury could conclude that the non-discriminatory reason put forth by defendants is a lie. *Shager v. Upjohn Company*, 913 F.2d 398, 401 (7th Cir.1990).

■ To establish a prima facie case of discrimination, plaintiff must present evidence that (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. *Franklin v. City of Evanston*, 384 F.3d 838, 847 (7th Cir.2004). The undisputed facts show that plaintiff has established at least two parts of the prima facie case. He is a member of a protected class because he is African–American and his termination qualifies as an adverse employment action. The parties disagree over whether plaintiff has presented evidence that similarly situated employees were treated more favorably. Plaintiff contends that he has identified other employees who are similarly situated and received more favorable treatment with respect to discipline and discharge.

■ To be similarly situated, employees must be directly comparable in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002). In a case in which an employee alleges that he was punished more severely than other employees, the relevant considerations include whether the employees dealt with the same supervisor, whether they were subject to the same standards and whether they engaged in similar misconduct. *Franklin*, 384 F.3d at 847; *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 531–32 (7th Cir.2003). The undisputed facts indicate that employees highlighted by plaintiff—Lindsay Pagel, Jamie Schad, Kelly Johns, Tim Brockert, Francisco Gutierrez, Manuel Jaime and Morgan Reed Manchester—are not similarly situated to him. Instead of proposing facts showing the similarities between himself and these employees, plaintiff focuses almost exclusively on the fact that these employees received employee warning notices before being fired, whereas he did not.

As a preliminary matter, I note that defendant Nakoma requires all of its employees, regardless of race, to sign a document in which they promise to abide by defendant's rules and regulations. From this, I infer that all of defendant's employees are subject to the same standards of conduct. Beyond this, however, the similarities between plaintiff and the other employees are virtually non-existent.

■ It is undisputed that (1) defendant Grasse, Avery, and Ken Gleed made the decision to fire plaintiff and (2) the reason for his termination was excessive absenteeism. Lindsay Pagel received five employee warning notices before being fired, but there is no indication that defendant

Grasse supervised her or that these warnings were for absenteeism. Although she received one employee warning notice for being late for work and not calling ahead, that is not enough to show that she and plaintiff are similarly situated. With respect to Jamie Schad, plaintiff has not provided information concerning the identity of her supervisor. Moreover, there is no indication that she ever received a warning before being terminated. With respect to Kelly Johns, the only information plaintiff provides is that she received a termination notice dated August 21, 2003. There is no evidence establishing her job duties, supervisor or any instances of absenteeism that were met with warnings instead of termination. Tim Brockert was terminated for absenteeism on May 30, 2001, but there is no evidence to suggest that he and plaintiff reported to the same supervisor or that either of his employee warning notices was for absenteeism. Francisco Gutierrez received at least one warning for tardiness and was terminated by defendant Grasse. However, plaintiff has not identified the conduct that prompted Gutierrez's two other warnings, or adduce any evidence that Gutierrez was absent from work repeatedly like plaintiff. All of Manuel Jaime's warning notices were signed by Tony Avoles or Alana Wagner and Avoles terminated his employment. Therefore, plaintiff has failed to show that he and Jaime reported to the same supervisor. Morgan Reed Manchester received a warning notice for being intoxicated at work, but there is no indication he ever received any warnings for repeated absenteeism. Thus, he and plaintiff did not engage in the same conduct.

Finally, even if I were to conclude that these employees were similarly situated to plaintiff, I would still find that plaintiff had failed to make out a prima facie case of discrimination because he has presented no evidence suggesting that he was meeting defendant Nakoma's legitimate expectations. Given his repeated absenteeism, it is unlikely such evidence exists.

### ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Nakoma Golf Club and James Grasse is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.